**THOMPSON et al., Appellants,**

v.

**PARK RIVER CORPORATION, d.b.a. Coney Island, et al., Appellees.**

[Cite as *Thompson v. Park River Corp.*, 161 Ohio App.3d 502, 2005-Ohio-2855.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–040508 and C–040544.

Decided June 10, 2005.

504

Curt C. Hartman, Carl Zugelter, and Michael P. Kelley, for appellants Jeffrey and Ann Thompson.

Brian A. Lee, for appellant Humana Health Plan of Ohio, Inc.

Christopher Moore, for appellees Park River Corporation, Coney Island, Inc., and Lisa Keeling.

Glen A. Markesbery, for appellees Jihad Rizkallah, Joanne Rizkallah, and Andrew Rizkallah.

---

GORMAN, Judge.

{¶ 1} The plaintiffs-appellants, Jeffrey and Diana Thompson, individually and as next friend of their son, Eric Thompson, appeal from the order of the trial court granting summary judgment against them on their claims for damages as a result of injuries suffered by Eric during a swimming class for advanced beginners at the Coney Island Sunlight Pool. Eight-year-old Eric was injured when another young student, Andrew Rizkallah, the son of Jihad and Joanne Rizkallah, admittedly pushed him into the deep end of the pool, and his foot became caught on an interior handrail. The Thompsons' complaint alleged negligence in the supervision of the students and the design of the pool, specifically the handrail, which allegedly posed a latently dangerous hazard. They further alleged that Andrew Rizkallah had acted negligently or recklessly or intentionally, and they asked that the trial court declare the rights of their insurance company, Humana Health Plan of Ohio, Inc., d.b.a. ChoiceCare, which had submitted a subrogation claim.

{¶ 2} In their three assignments of error, the Thompsons challenge the grant of summary judgment to the Coney Island defendants (the first assignment of error); to Lisa Keeling, the swimming instructor (the second assignment of error), and to the Rizkallah defendants (the third assignment of error). Choice-Care, which filed a cross-claim against the other named defendants, has filed a

separate appeal and has adopted verbatim the assignments of error and arguments of the Thompsons.

{¶ 3} For the following reasons, we affirm the trial court's judgment.

## BACKGROUND

*Coney Island Defendants and Keeling*

{¶ 4} In support of their motion for summary judgment, the Coney Island defendants and Keeling asserted the lack of any evidence of their own negligence contributing to Eric's injuries. To support this contention, they presented the affidavits of both Keeling and Victor Nolting, the president of Coney Island, Inc.

{¶ 5} *Nolting Affidavit:* Responding to the Thompsons' claim that the handrail posed a safety hazard, Nolting stated that the handrail was part of the Sunlight Pool's original installation in 1925 and that the handrail had not been materially altered since that date. He stated that the handrail was routinely inspected, maintained, and repaired in order to ensure its safe condition. According to Nolting, such inspections and maintenance had never revealed any concerns relating to the safety of the handrail, nor had Coney Island ever received any complaints from pool patrons relating to the handrail's safety

{¶ 6} *Keeling Affidavit:* Keeling stated that she had worked as a swimming instructor since the mid–1970s and had been intermittently employed in that capacity by Coney Island for almost 20 years. She further proffered that she had received a certificate of water-safety instruction at the beginning of her career and had "maintained all necessary and appropriate training and certifications since that time."

{¶ 7} According to Keeling, the class in which Eric Thompson was injured began at 10:15 a.m. on June 24, 1999. She stated that she had not observed the events that led to Eric's ending up in the pool but that she had jumped in quickly to assist him. She stated that none of the students enrolled in the class participated in horseplay or roughhousing during instruction and that she was not aware of any previous behavior leading to the type of injury experienced by Eric. Indeed, she stated that during her career at Coney Island, she was unaware of any swimming-class student or pool patron injured on the handrail running the length of the deep end of the pool. She also stated that at no time during his enrollment in her class was Andrew Rizkallah acting under her control or direction.

{¶ 8} In response to the motion for summary judgment by the Coney Island defendants and Keeling, the Thompsons submitted the affidavits of Diana Thompson, Jeffrey Thompson, Eric Thompson, and Allison Osinski, an aquatics expert.

{¶ 9} *Diana Thompson Affidavit:* Diana Thompson stated that she had informed Keeling prior to Eric's swimming instruction that he suffered from spinal muscular atrophy (SMA). She stated that she had told Keeling that this condition created a weakness in Eric's muscles that would affect his coordination and the rate at which he might be able to perform certain functions. She stated that, on the morning of Eric's injury, she had entrusted Eric to Keeling's "care and custody" and that Keeling had assumed "control and supervision" of her son along with the other students in the class. She stated that she had left the vicinity of the pool but had returned when she heard her son screaming and an announcement over the public-address system requesting that she report to the pool's office. She stated that, as she got closer to the Sunlight Pool, she saw her son "struggling to stay afloat as his leg was entrapped in a handrail located at or just below the water line."

{¶ 10} Diana Thompson also described and provided photographs of a barrier located "[o]n the deck of the pool in the area where this handrail [wa]s located." She stated that in order for her son to overcome this barrier, he had to have climbed over the barrier and positioned himself on the inner lip of the deck. She stated that she subsequently learned that Keeling had "instructed the students in the class to position themselves inside the barrier on the lip." She further stated that on the evening of the accident, she spoke to Keeling, and Keeling told her that she, Keeling, had had to tell Andrew Rizkallah "to knock it off or to settle down on at least two occasions that day prior to the incident with Eric." She also stated that in the same conversation, Keeling told her that, after she jumped into the pool to assist Eric, she was not receiving sufficient aid and had to yell to the lifeguard, "We're both going to drown. I need help!"

{¶ 11} *Jeffrey Thompson Affidavit:* Jeffrey Thompson stated that he personally inspected the Sunlight Pool within a week after his son's injury and that, aside from taking photographs (photocopies of which were attached), he noticed that the anchors of the handrail were "heavily rusted[,] causing the handrail to pull away from the wall and increasing the gap between the wall and handrail."

{¶ 12} *Eric Thompson Affidavit:* Eric Thompson stated that on the morning of his injury, Keeling had instructed the children to climb over the deck barrier and position themselves on the lip of the deep end of the pool. He stated that while on the ledge, he was "pushed or otherwise caused to fall into the pool by another kid in the swimming class." He stated that while falling, his foot or lower leg became caught between the wall and the handrail. According to Eric, his foot was stuck for "a long period of time," a situation that caused him "great pain and agony."

{¶ 13} *Osinski Affidavit:* Osinski identified herself as the principal and owner of Aquatic Consulting Services, located in San Diego, California. She stated that

she specialized in providing consultation services for aquatic risk management and aquatic facility design, management, and operation. She stated that she had a Ph.D. from the University of Maryland, a master of sciences from Florida International University, and a bachelor of science in physical education with a specialty in aquatics from Hillsdale College. She stated further that she served on the advisory board to the National Swimming Pool Foundation and on the editorial advisory board for several aquatic publications and journals. She also stated that she held certifications from the National Swimming Pool Foundation, the Association of Underwater Instructors, and the Aquatic Council of the American Alliance for Health, Physical Education, Recreation & Dance.

{¶ 14} According to Osinski, she had reviewed photographs of the Sunlight Pool. In her view, the handrail violated the standards of the American National Standards Institute ("ANSI"), which she described as "a private, non-profit organization that administers and coordinates the U.S. voluntary standardization and conformity assessment system," as well as the National Pool and Spa Institute ("NPSI"), which she described as "an international trade association of more than 5,300 manufacturers, distributors, retailers, service companies and builders in the pool/spa and hot tub industry." She quoted standards from these organizations that prohibited "protrusions, extensions, means of entanglement or other obstructions in the swimming area which can cause the entrapment or injury of the user" and that also prohibited ledges beyond a certain size. She also cited swimming-pool design standards promulgated by the Ohio Department of Health in a 1995 publication entitled "Design Guide—Public Swimming, Wading, and Diving Pools," which prohibited "underwater or overhead projections, or obstructions, which would endanger user safety." [1]

{¶ 15} Based upon her view that the Sunlight Pool's handrail violated ANSI and NPSI standards, Osinski opined that the handrail constituted an "inherently dangerous condition that should have been discovered and recognized by a qualified aquatic safety inspector upon any inspection by a qualified aquatic inspector." She further stated that the handrail "could reasonably be foreseen to cause injury to anybody diving or otherwise entering the pool from over the handrail."

{¶ 16} With regard to the student-instructor ratio of Eric's swimming class, Osinski stated that while she was aware that certain swimming-instruction programs, such as those provided by the Red Cross and the YMCA, had standards regarding the maximum allowable ratio, she was not able to obtain those standards prior to providing her affidavit. But she expressed her view,

---

1. Although this publication was purported to be attached as an exhibit, the exhibit in the record before us contains only a photocopy of the cover page.

based upon her own experience, knowledge, and training, that one instructor for 50 students "would not meet any acceptable standard for the instruction and supervision of children in the age range of 9 to 12 years old participating in a swimming instruction class." She stated that having only one instructor for 50 swimming students "would have inherently placed such students in a dangerous condition, especially considering that children are involved."

{¶ 17} Finally, Osinski stated her opinion that "positioning students (and especially children) in a swimming class so as to dive into a pool over which a handrail is located at or just below the water line and which protrudes out from the wall (such as that at Sunlight Pool) falls below the standard to be expected of swimming instructors' responsibility for the safety of those in their charge."

{¶ 18} In response to the Thompsons' memorandum and affidavits opposing summary judgment, the Coney Island defendants and Keeling submitted a further affidavit from Nolting, specifically to rebut the affidavit of Osinski.

{¶ 19} *Second Nolting Affidavit:* Nolting stated that the Sunlight Pool had been inspected by the Ohio Department of Health on an annual basis and that the pool was "not in violation of the standards developed by the Ohio Department of Health during the summer of 1999." Attached to Nolting's affidavit was a copy of the 1999 Ohio Department of Health inspection report for Sunlight Pool. Nolting further stated that, to the best of his knowledge, the standards for public swimming pools developed by the American National Standards Institute, as cited by Osinski, were "merely instructive" and that the Sunlight Pool was not required to comply with those standards.

{¶ 20} The Ohio Department of Health inspection report attached to Nolting's affidavit had numerous points of inspection, including lifeguards, water clarity, water quality, safety, signs and enclosures, recirculation/filtration, structure and fixtures, sanitation, and records. Each category had a checklist, with the last box marked "other" and a direction for the inspector to include any comments. Furthermore, the inspection report had a separate section for any administrative-code violations, including those concerned with pool "design requirements." One of the categories referred to providing or maintaining "ladders, treads, stairs, and/or handrails." Another category referred to providing "safe for patrons" a pool shape, design, "and/or other features." The report, dated May 26, 1999, bore no negative marks or comments.

*Rizkallah Defendants*

{¶ 21} The Rizkallahs filed both a motion to dismiss and a motion for summary judgment. In their motion to dismiss, Jihad and Joanne Rizkallah argued that, pursuant to R.C. 3109.10, they were liable as parents for the conduct of Andrew only if he had "willfully and maliciously" assaulted Eric "by a means or force

likely to produce great bodily harm." They asserted that they were entitled to a dismissal under Civ.R. 12(B)(6) because the Thompsons' pleading failed to state such a claim and that even if such a claim could be gleaned from the pleadings, the applicable two-year statute of limitations had expired.

{¶ 22} In their contemporaneous motion for summary judgment, the Rizkallahs argued that there was no evidence that as parents they should have foreseen Andrew's act of pushing Eric into the pool. Consequently, they argued, they could be vicariously liable only under R.C. 3109.10, which did not apply, for the reasons stated in their motion to dismiss. With regard to Andrew's individual culpability, they argued that the swimming class was a recreational activity and that Andrew's conduct was neither reckless nor intentional but a foreseeable and natural part of a swimming class involving rambunctious children. In support of their summary judgment motion, the Rizkallahs submitted the affidavit of their son, Andrew.

{¶ 23} *Andrew Rizkallah Affidavit:* Andrew Rizkallah stated that on June 24, 1999, he and Eric Thompson were "playing around" on the side of the pool, waiting their turn to jump in, when Eric first pushed him into the pool. He stated that being pushed into the pool did not injure him. According to Andrew, he got out and then pushed Eric into the pool without any intent to inflict injury or any idea that Eric might suffer an injury.

{¶ 24} In response to the Rizkallahs' motions, the Thompsons submitted a second affidavit from Eric Thompson.

{¶ 25} *Second Eric Thompson Affidavit:* Eric Thompson stated that he was eight years old at the time of his injury. He stated that at no time during the swimming class on the day of his injury did he push anyone, including Andrew Rizkallah, into the swimming pool.

## ACTION BY THE TRIAL COURT

{¶ 26} On July 8, 2004, the trial court granted the motions for summary judgment of the Coney Island defendants and Lisa Keeling, as well as that of the Rizkallahs.[2] The court stated that Eric Thompson had been a business invitee of the Coney Island defendants and that they had owed him a duty to notify him only of latent defects of which they were aware or should have been aware. Citing the lack of any evidence demonstrating that the handrail had caused any injury in the entire history of the pool, the court concluded that there was no

---

2. By entry dated April 28, 2004, the court had originally granted the motion to dismiss of Jihad and Joanne Rizkallah. By entry dated June 17, 2004, however, the trial court set aside its earlier order on a procedural ground, and the motion to dismiss was never ruled upon afterward.

evidence that the Coney Island defendants were aware that the handrail posed an unreasonably dangerous hazard. Further, the court rejected the opinion of Osinski as evidence that the Coney Island defendants should have been aware of the hazardous nature of the handrail, stating that Osinski's opinion was "belied by the historical facts." The court determined that no reasonable minds could have concluded that the handrail was latently hazardous on the facts presented.

{¶ 27} The trial court also ruled that the Coney Island defendants and Keeling could not be considered negligent for not stopping Andrew Rizkallah from pushing Eric into the pool. In making this determination, the court noted that there was no evidence that Andrew had previously pushed anyone into the pool. Although the court acknowledged that Diana Thompson had stated in her affidavit that Keeling had told her that Andrew Rizkallah had previously acted up in class, the court reasoned that since there was no evidence that Andrew's previous horseplay had resulted in his pushing anyone into the pool, the Coney Island defendants were not negligent in failing to address such behavior. The court concluded that Andrew's act of pushing Eric into the pool was an "intentional instantaneous act which [the Coney Island defendants and Keeling] could not have stopped without having foreknowledge it was about to happen." The court ruled that Osinski's opinion that the student-instructor ratio was too high to be safe did not alter this conclusion, because Osinski did not state that a lower ratio would have necessarily prevented Andrew from "pushing Eric into the pool on the spur of the moment."

{¶ 28} As for the liability of the Rizkallahs for Andrew's actions, the court ruled that the swimming class was a recreational rather than an educational activity. Citing *Marchetti v. Kalish* (1990), 53 Ohio St.3d 95, 559 N.E.2d 699, the court concluded that Andrew's act of pushing Eric into the pool could only be actionable, given the recreational nature of the class, if his actions were either reckless or intentional. Finding no evidence that Andrew had attempted to purposefully injure Eric, the court ruled that Andrew's actions were not actionable.

## ANALYSIS

### First Assignment of Error—the Coney Island Defendants

{¶ 29} In their first assignment of error, the Thompsons assert that the trial court erred in granting summary judgment to the Coney Island defendants. They argue that the Coney Island defendants failed to meet their burden under *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264, to negate the questions of material fact raised by Osinski's opinion that the Sunlight Pool's handrail violated ANSI and NPSI aquatic standards. They also argue that questions of material fact were created regarding whether the Coney Island corporate defen-

dants had violated their duty as business owners to discover the dangerous condition posed by the handrail in order to protect pool patrons from a latent hazard. Finally, they argue that Osinski's opinion created a genuine issue of material fact concerning whether the Coney Island defendants had failed to provide a safe student-teacher ratio. We consider each argument in turn.

*ANSI and NPSI Standards*

■ {¶ 30} Initially, we note that the Thompsons asserted a negligence claim against the Coney Island defendants and not a products-liability claim. A products-liability claim is focused on design concepts and asks simply whether a safer pool could have been built. If a safer design was practicable and would have prevented injury, strict liability is imposed. A negligence claim, on the other hand, is focused away from the drawing board and onto the behavior of the defendants, asking whether such behavior violated a duty of reasonable care.

■ {¶ 31} Under Ohio law, a business owner's duty to protect its customers from harm is predicated on the owner's superior knowledge of a specific condition that threatens injury. *Debie v. Cochran Pharmacy–Berwick, Inc.* (1967), 11 Ohio St.2d 38, 40 O.O.2d 52, 227 N.E.2d 603; *McGuire v. Sears, Roebuck & Co.* (1996), 118 Ohio App.3d 494, 497, 693 N.E.2d 807; *Kolsto v. Old Navy, Inc.*, 1st Dist. No. C–030739, 2004-Ohio-3502, 2004 WL 1486114. A business owner is not an insurer and is not liable based solely on the fact that the premises could have been made safer. See *Paschal v. Rite Aid Pharmacy, Inc.* (1985), 18 Ohio St.3d 203, 204, 18 OBR 267, 480 N.E.2d 474. Rather, the business owner has a duty only to keep the premises in a reasonably safe condition and to warn its customers of any unreasonably dangerous conditions of which it either has knowledge or should have knowledge. *Perry v. Eastgreen Realty Co.* (1978), 53 Ohio St.2d 51, 53, 7 O.O.3d 130, 372 N.E.2d 335. The normative aspect of this requirement precludes a business owner from using willful ignorance to escape liability. The business owner has a duty to inspect the premises to discover possible unsafe conditions and to take reasonable precautions to protect its customers from dangers that are reasonably foreseeable in their use of the premises. Id.; *Stinespring v. Natorp Garden Stores, Inc.* (1998), 127 Ohio App.3d 213, 216, 711 N.E.2d 1104.

{¶ 32} There is absolutely no evidence of record that the Coney Island defendants actually knew that the handrail of the Sunlight Pool posed an unreasonable danger to pool patrons. Indeed, all the evidence is to the contrary. Nolting stated that the handrail had been in existence since the pool was built in 1925 and that it had never caused an injury similar to that suffered by Eric. In an interrogatory, the Coney Island defendants were asked to identify "all complaint, injuries, or incidents involving or relating to the Hand Bar." Their simple answer was "None." Additionally, Nolting stated that the pool was subject to yearly inspection by the Ohio Department of Health and that for the year 1999, as

evidenced by the report itself, the Sunlight Pool passed inspection without any negative comments in any area, including pool design.

{¶ 33} As for the ANSI and NPSI standards referred to by Osinski, there is no evidence that the Coney Island defendants were aware of these standards in such a way that they actually caused them to doubt that the handrail was safe notwithstanding its spotless safety record and the pool's unblemished yearly safety inspection. These standards were relevant, therefore, only to the extent that they could be used to show that the Coney Island defendants reasonably *should* have known that the handrail was unsafe. But the problem with this argument is that the record is replete with evidence that the Coney Island defendants had every reason to believe that the handrail was safe, including the fact that the state health department had not raised any issue about the handrail's safety during its yearly inspections of the pool. Although the standard is normative as to what the Coney Island defendants should have known, the norm is that of a reasonably prudent business owner, not an overly zealous business owner determined to guarantee the absolute safety of its patrons.

{¶ 34} It should be pointed out that Ohio's own regulations regarding pool design are quite extensive and specific. See Ohio Adm.Code 3701–31–04. These regulations require handrails for all steps and ladders leading to competitive diving boards, see Ohio Adm.Code 3701–31–04(G)(2) and (3), but they are silent as to handrails or handbars inside a pool. Even the most recent design requirements for swimming pools constructed, installed, renovated, or substantially altered after January 1, 1999, are devoid of regulations regarding handrails or handbars. See Ohio Adm.Code 3701–31–04.1. Significantly, the regulations applicable to newer pools adopt ANSI standards for skimmers, filters, and disinfectant filters, as well as ANSI and NPSI standards for recreational diving boards, but they do not make reference to the broader safety standards cited by Osinski in her affidavit. Ohio Adm.Code 3701–31–04.1(K)(1) and (3), and (N)(1).

{¶ 35} The Coney Island defendants cite as persuasive authority the decision of the Tenth Appellate District in *Bae v. Dragoo & Assoc., Inc.*, 156 Ohio App.3d 103, 2004-Ohio-544, 804 N.E.2d 1007. In *Bae*, the plaintiff also employed Osinski as an expert, and she opined that the defendants in that case, despite meeting all administrative-code requirements, were nonetheless negligent for not having automated external defibrillators, electronic or video surveillance systems, and an emergency phone tied directly to rescue services. Rejecting the plaintiff's argument, similar to Thompsons' here, that Osinski's opinion was sufficient to create a triable issue of negligence, the court in *Bae* noted, "Contrary to Osinski's assertions, [the defendant] is simply not required to maintain a perfectly safe pool. Unfortunately, there is no such thing. Rather, [the defendant's] duty is to keep the premises in a *reasonably* safe condition." (Emphasis sic). Id. at ¶ 24.

Elsewhere, the court stated, "Although Osinski testified to numerous ways to make the pool safer than what is required under Ohio law, her testimony does not raise any 'genuine' issues of material fact in this case. Both random inspectors testified that this particular pool was a good pool and that there were no violations of the applicable code during any inspections." Id. at ¶ 25.

{¶ 36} Similar to the court in *Bae*, we are convinced that Osinski's statements regarding ASNI and NPSI aquatic standards were not sufficient to create a triable issue concerning whether the Coney Island defendants knew, or should have known, that the handrail posed a latent hazard. These standards suggest the possibility of a safer pool but do not alter the evidence that the Sunlight Pool was reasonably safe and that the Coney Island defendants had no reason to think otherwise.

*Duty to Discover*

{¶ 37} In their second argument under their first assignment of error, the Thompsons stress again their view that the record presented a triable issue concerning whether the Coney Island defendants breached their duty to discover what they allege was the inherently dangerous nature of the handrail. They argue that although the handrail had existed for decades without causing a single injury, the Coney Island defendants remained "blissfully ignorant or blind to the dangerous condition" that the handrail presented. They argue that the Coney Island defendants failed in their duty to inspect the pool for possible dangerous conditions, and they point to the photographic evidence that the handrail was rusting and its anchors loosening or becoming separated from the pool wall.

{¶ 38} As for the photographic evidence that the anchors of the handrail were rusted and had separated from the pool wall, there is nothing in the record that indicates that the condition of the handrail contributed in any way to Eric's injuries. Without such evidence, the condition of the handrail, as opposed to its existence, was immaterial. There is likewise no evidence that the Coney Island defendants chose to be "blissfully ignorant" of any danger posed by the handrail. Inspectors employed by the Ohio Department of Health inspected the pool yearly. There is no evidence that these inspectors were less than qualified. Likewise, there is no evidence that their inspections were cursory or that the Coney Island defendants had any reason to doubt the validity of their findings. The 1999 report, which is of record, shows that the inspection included pool design and allowed for any negative comments on any design feature that struck the inspector as unsafe or a code violation. There were no negative comments or marks to indicate an unsafe condition.

{¶ 39} Combined with the handrail's accident-free safety record, we do not discern any evidence that would have created a triable issue as to whether the

Coney Island defendants had failed in their duty to inspect the pool or to have it inspected. Based on the photographs provided by the Thompsons, the handrail, which looks to have protruded from the deck by only a matter of inches and to have been positioned just below, at, or even slightly above water level, appears quite conspicuous and should have been discerned immediately by anyone using or walking by the deep end of the pool. To the extent that it posed any risk, that risk was clearly not latent but open and obvious and easily avoidable. Osinski herself stated that the handrail "could reasonably be foreseen to cause injury to anybody diving or otherwise entering the pool from over the handrail." We interpret this to mean simply that anyone using the pool and exercising normal caution would have seen the railing and avoided injuring themselves on it. It is well settled that an owner of property has no duty to warn invitees of an open and obvious danger upon the assumption that invitees will discover such danger and take appropriate measures to protect themselves. *Armstrong v. Best Buy Co.*, 99 Ohio St.3d 79, 2003-Ohio-2573, 788 N.E.2d 1088. The open-and-obvious doctrine is viable even after the enactment of Ohio's comparative-negligence statute. Id. at ¶ 12.

*Student–Instructor Ratio*

{¶ 40} As noted, Osinski stated that one instructor for 50 students "would not meet any acceptable standard for the instruction and supervision of children in the age range of 9 to 12 years old participating in a swimming instruction class." She stated that having only one instructor for 50 swimming students "would have inherently placed such students in a dangerous condition, especially considering that children are involved."

{¶ 41} Initially, it should be pointed out that the record does not establish how many students were actually in attendance on the day that Eric Thompson was injured. Keeling was asked in an interrogatory to identify all individuals "who were registered to participate in or actually participated in the swimming class" in which Eric was injured. Keeling responded by listing the names of 51 students. Because of the way the question was framed, it is unclear how many of the registrants were actually attending class on that day. In other words, as far as the record is concerned, the class could have been either fully or sparsely attended. Significantly, in their amended complaint, the Thompsons alleged that the actual class size was only 40 students. On this basis alone, the relevance of Osinski's opinion regarding the safety of a 1 to 50 instructor-to-student ratio is subject to debate.

{¶ 42} But even granting the Thompsons the benefit of all reasonable inferences and assuming that all 51 students who registered for the class were in attendance that day—in other words that no registrants had dropped out or

decided simply not to come to class—we are convinced that Osinski's opinion was only evidence that such a high ratio was "inherently unsafe." Again, similar to the rusty condition of the handrail, whether or not the student-teacher ratio was "inherently unsafe" was immaterial unless the size of the class could be said to have proximately caused Eric's injury. Osinski's opinion did not explain, or even attempt to explain, how the instructor-student ratio caused Eric's injuries, or how a smaller ratio would have prevented his injury. Critically, there was no evidence presented by either party as to what Keeling was doing, or where she was positioned, at the time Eric was pushed into the pool. As far as the record shows, Keeling could have been either ten feet away from young Eric and Andrew, or 100 yards away. Additionally, there is no evidence of record of how long the horseplay between Andrew and Eric continued—whether it lasted for minutes or was over as quickly as it began, precluding any sort of adult intervention, even by an adult standing fairly close to the two boys and giving full attention to the class.

{¶ 43} Whether there is a genuine issue of material fact depends on whether the evidence presents "a sufficient disagreement to require submission to a jury" or whether it is so "one-sided that one party must prevail as a matter of law." *Turner v. Turner* (1993), 67 Ohio St.3d 337, 340, 617 N.E.2d 1123. Here, the evidence presented by the Thompsons was insufficient to overcome the overwhelming evidence that the Sunlight Pool met all safety requirements under Ohio law, that it was reasonably safe for public use, and that the Coney Island defendants had no reason to suspect otherwise, particularly given the 1999 safety inspection by the Ohio Department of Health that gave no indication of any safety hazards. Furthermore, although the Thompsons presented evidence that the handrail was deteriorating and that a 1 to 50 instructor-student ratio was too high to be considered safe, they presented no evidence that either of these factors played even the slightest role in causing Eric's injury.

{¶ 44} Accordingly, the Thompsons' first assignment of error is overruled.

## Second Assignment of Error

{¶ 45} In their second assignment of error, the Thompsons assert that the record created genuine issues of material fact concerning Keeling's negligence (and that of the Coney Island defendants under a theory of respondeat superior). They identify three areas of dispute: (1) whether Eric Thompson pushed Andrew Rizkallah into the pool first, (2) whether Keeling had witnessed prior incidents of horseplay between Eric and Andrew on that particular day, and (3) whether, consistent with Osinski's opinion, Keeling was negligent in positioning the class along the deck of the deep end—in other words directly over the handrail.

{¶ 46} Without doubt, there was a factual dispute as to whether Eric first pushed Andrew into the pool. Andrew said that he did—Eric said that he did not. The point was immaterial, however, to Keeling's negligence without some evidence to show how long the two were engaged in horseplay, regardless of who was doing what to whom. Although the trial court described the incident as "instantaneous" and "spur of the moment," the more correct statement is that the record simply does not allow any conclusion with respect to how quickly the boys' horseplay began and ended. Under these circumstances, without any evidence of the time available—if any—for Keeling to have reacted to the mischief between Andrew and Eric, there is simply no basis upon which a trier of fact could reasonably have concluded that Keeling was negligent for not doing more to stop it.

{¶ 47} The evidence that Keeling was aware that Andrew had been involved in previous incidents of horseplay that morning did not change this result. As alluded to by the trial court, the severity of those earlier incidents of horseplay was not shown in the record. Indeed, it is not clear what sort of horseplay Andrew was alleged to have been earlier involved in: whether it was relatively innocuous—in other words, mostly play—or whether it involved such obstreperous misbehavior that it threatened class safety and should have resulted in Keeling's isolating him from the rest of the group, or at least keeping him under closer scrutiny. The trial court correctly reasoned that without evidence that Andrew's previous misbehavior included shoving a fellow classmate into the pool, there was no basis to conclude that Keeling should have foreseen such behavior.

{¶ 48} Finally, with respect to Osinski's opinion that it was negligent for Keeling to have positioned the students on the deck of the pool above the handrail, we have previously determined that there was insufficient evidence to create a factual issue as to whether any part or aspect of the Sunlight Pool's design, including the handrail, was unreasonably unsafe. This being so, it would be illogical to hold that there was evidence that Keeling was negligent simply by having her students line up over the deep end because of the existence of the handrail. Osinski's opinion, although that of an expert, was clearly premised upon her theory that the handrail was unreasonably dangerous, a theory that we have already determined under the first assignment of error to be insufficient to create a question of material fact, given the handrail's spotless safety record and inspection history.

### Third Assignment of Error

{¶ 49} As for Andrew's parents, we hold that they were properly dismissed as defendants for the reasons stated in their motion to dismiss as well as in their motion for summary judgment—that parental vicarious liability is

controlled by R.C. 3109.10 and that, aside from the issue of the statute of limitations, there was simply no evidence of record to support a claim that their son Andrew had willfully and maliciously assaulted Eric "by a means or force likely to produce great physical harm."

{¶ 50} As for Andrew's individual liability, the parties continue to quarrel in their briefs over whether the swimming class was a recreational or an educational activity. The general rule is that where individuals engage in recreational or sports activities, they assume the ordinary risks of the activity and cannot recover for an injury unless it can be shown that the other party's actions were either reckless or intentional. *Marchetti*, 53 Ohio St.3d at 100, 559 N.E.2d 699. The rule is the same for children and adults. Id. at 99, 559 N.E.2d 699. The rule applies whenever the parties involved are "engaging in some type of recreational or sports activity" regardless of whether it is "organized, unorganized, supervised, or unsupervised." Id. at 98, 559 N.E.2d 699.

{¶ 51} In *Marchetti*, the children were engaged in a game of "kick the can," which the court assumed without analysis fell into the category of either a sport or a recreational activity. Here the question is closer, but we agree with the trial court that swimming lessons, although certainly having safety and educational benefits, are best described as a type of supervised recreational activity.

{¶ 52} When swimming lessons involve children between the age of 8 and 12, a certain amount of rambunctious behavior, jostling, pushing, and shoving, is perhaps to be expected. While not a contact sport, swimming for children is often an excuse for misbehavior. In any case, the court in *Marchetti*, and later in *Gentry v. Craycraft*, 101 Ohio St.3d 141, 2004-Ohio-379, 802 N.E.2d 1116, made clear that it wanted to avoid an analysis that attempted to "delve into the minds of children to determine whether they understand the rules of the recreational or sports activity that they are engaging in" and to focus instead on "the conduct or actions of the tortfeasor." *Marchetti*, 53 Ohio St.3d at 99, 559 N.E.2d 699. By requiring that a tortfeasor in a recreational activity be found to have acted either recklessly or intentionally before an injured party can recover damages, the court made clear that the tortfeasor must have actually intended the consequences of his act or have known or should have known that his conduct could cause such consequences, thus making his behavior substantially worse than mere negligence. Id. at 100, 559 N.E.2d 699.

{¶ 53} Here, there was no evidence that Andrew sought to deliberately injure Eric. Andrew denied having such intent. Nothing in the record contradicted this assertion. There is no evidence that the boys bore any particular animus toward each other. And it should be emphasized that there was no evidence that Andrew had singled out Eric for bullying because Eric was afflicted with MSA.

Indeed, other than to note their son's condition, the Thompsons have not alleged any connection between his MSA and the accident. Presumably, all the students in the advanced-beginner class, including Eric, knew how to swim and thus would have been expected to escape injury even if suddenly shoved into the pool. In sum, there was no basis in the record to conclude that Andrew's conduct was anything but an ill-advised, childish prank that resulted in entirely unforeseen and unimagined consequences when Eric's foot unfortunately became caught on the handrail, causing the first injury of its kind in the entire history of the pool.

{¶ 54} Finally, even if a simple negligence standard were to be applied in this case, as Justice Pfeifer noted in his dissent in *Gentry,* the law of negligence already "affords protection for children from being found negligent for doing the things kids do." *Gentry,* 101 Ohio St.3d 141, 2004-Ohio-379, 802 N.E.2d 1116, at ¶ 17. "Children are not chargeable with the same care as persons of mature years. Although children are required to exercise ordinary care * * *, such care, as applied to them, is that degree of care which children of the same age, education, and experience, of ordinary care and prudence, are accustomed to exercise under similar circumstances." *Cleveland, Cincinnati, Chicago & St. Louis Ry. Co. v. Grambo* (1921), 103 Ohio St. 471, 134 N.E. 648, paragraph one of the syllabus. In this case, we reiterate that there is no evidence that Andrew could have foreseen any injury to Eric by pushing him into the pool other than his getting suddenly and unwillingly wet. Absent any such evidence, Andrew's conduct could only be described as childish misbehavior typical of "the things kids do," but not, on this record, actionable negligence.

## CONCLUSION

{¶ 55} Based on the above analysis, we overrule the Thompsons' three assignments of error in their appeal, numbered C–040508, and the identical three assignments of error in ChoiceCare's appeal, numbered C–040544. Accordingly, the judgment of the trial court is affirmed.

Judgment affirmed.

HILDEBRANDT, P.J., and PAINTER, J., concur.