[Cite as *Ochall v. McNamer*, 2016-Ohio-8493.]

## IN THE COURT OF APPEALS OF OHIO

## TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| Andrea Ochall et al., | : | |
| Plaintiffs-Appellants/ Cross-Appellees, | : | No. 15AP-772 (C.P.C. No. 14CV-5498) |
| v. | : | |
| | | (REGULAR CALENDAR) |
| William M. McNamer et al., | : | |
| Defendants-Appellees, | : | |
| Mark McMillen et al., | : | |
| Defendants-Appellees/ Cross-Appellants. | : | |
| | : | |

# D E C I S I O N

## Rendered on December 29, 2016

**On brief:** *Kitrick, Lewis & Harris, Co. LPA, Mark Lewis, Mark Kitrick,* and *Elizabeth Mote,* for appellants. **Argued:** *Mark Lewis.*

**On brief:** *The Carr Law Office, LLC, Adam E. Carr,* and *Eric K. Grinnell,* for appellees William M. and Elizabeth McNamer. **Argued:** *Adam E. Carr.*

**On brief:** *Lane Alton, Joseph A. Gerling,* and *Monica L. Waller,* for appellees/cross-appellants Sharon and Mark McMillen. **Argued:** *Monica L. Waller.*

**On brief:** *Hollern & Associates,* and *Edwin J. Hollern,* for appellees James Porter and Jane Doe # 1. **Argued:** *Edwin J. Hollern.*

APPEAL from the Franklin County Court of Common Pleas

KLATT, J.

{¶ 1}   Plaintiffs-appellants, Andrea Ochall, her husband Robert Ochall, and their two minor children, appeal from a judgment of the Franklin County Court of Common Pleas, granting the motions for summary judgment of defendants-appellees, Sharon and Mark McMillen, James Porter and his minor daughter, Jane Doe, and William and Elizabeth McNamer ("Liz"). For the reasons which follow, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}   On May 23, 2014, appellants filed a complaint against the McNamers, the McMillens, Porter, Doe, McMillen Paving and Sealing, Inc. ("MP&S"), and McMillen Paving, Inc. The complaint asserted claims for negligence, recklessness, negligent and/or reckless design, construction, operation and maintenance, failure to warn or instruct, negligent infliction of emotional distress, negligent entrustment, negligent supervision, vicarious liability, and loss of consortium. The events giving rise to the complaint occurred on September 20, 2013, when Mrs. Ochall was seriously injured while watching a go-kart race on the McMillens' property.

{¶ 3}   On the day of the incident, the McNamers had invited the Ochalls to their home in Hilliard, Ohio, for the purpose of using the go-kart track located on the McMillens' property. The McNamers and the McMillens are next-door neighbors and very good friends. Liz McNamer and Robert Ochall are co-workers, and Liz McNamer had previously invited the Ochalls over to use the McMillens go-kart track in 2011. The Ochall family, both the adults and their two children, drove go-karts on the McMillens' track during their visit in 2011. The Ochalls, however, had never met the McMillens before filing the present lawsuit.

{¶ 4}   The McMillens' son, Brian McMillen, with assistance from his younger brother Scott, constructed the go-kart track in the McMillens' backyard between 1994-1995, when Brian was between the ages of 18 and 19-years-old. The McMillens own and operate a paving and sealing company, MP&S. Brian is now the vice president of MP&S, but was not when he originally constructed the track.

{¶ 5}   Brian and his brother built the track in their spare time, and used some company equipment to build it. The McMillens routinely used company equipment on their home projects. Brian explained that the track "basically is a twisted up driveway."

(Jan. 5, 2015 Brian McMillen Dep. at 62.) The McMillens have never charged anyone money to use the track and they do not operate the track commercially, it is something they simply use "to [their] liking." *Id.* at 88.

{¶ 6} Although the McNamers and the McMillens are close frends, the McNamers would always ask the McMillens for permission before bringing guests over to use the track. Thus, prior to the Ochalls' 2013 visit, Liz McNamer asked the McMillens if they could bring the Ochalls over to use the track. The McMillens said yes, and Mark McMillen opened the McMillens' barn and prepared the go-karts for the group's use.

{¶ 7} The McMillens own five go-karts and the McNamers own one go-kart, but the go-karts are all the same make and model. Brian McMillen purchased all the go-karts from the same vendor shortly after he constructed the track, and the McNamers paid the McMillens directly for their one go-kart. Brian explained that he selected these specific go-karts because he "didn't want to go so fast out there" so that people would "need helmets." *Id.* at 109. Brian noted that the go-karts have "a bumper, * * * a full harness and had a roll cage," and could reach a maximum speed of 28 miles per hour. *Id.* Brian also noted that he could not "recall whether or not we actually got a manual for the karts," noting that he did not "remember even seeing a manual." *Id.* at 115. The go-karts all have stickers on the back which advise the drivers that there is no bumping.

{¶ 8} The McMillens store their go-karts in their barn, and there is a paved driveway which connects the barn to the track. The driveway connects with the track at the track's start/finish line. Porter explained that people would generally congregate on the paved area next to the start/finish line in order "to trade positions with the drivers or to watch people driving by." (Dec. 30, 2014 James J. Porter Dep. at 41.) Liz McNamer stated that she "always stood" on the paved area near the start/finish line when she was at the track. (Feb. 10, 2015 Elizabeth G. McNamer Dep. at 56-57.) Mrs. Ochall stated that, during her visit in 2011, she was "instructed to stand in that – that particular area" by Liz McNamer. (Dec. 4, 2014 Andrea L. Ochall Dep. at 29.) No one told Mrs. Ochall where to stand during the 2013 visit. *Id.* at 135-36.

{¶ 9} Brian McMillen testified that he designed the track "not to have any spectators." (B. McMillen Dep. at 168.) Brian explained that, when he took "people out there, that's part of my deal: Stay up in the barn until you come up and get in a kart." *Id.*

at 175. He also noted that anyone at the track had to "be aware. You've got cars going around the track. You have to be aware that that's an issue." *Id.* Mark McMillen had placed a bench at the back edge of that paved area next to the start/finish line. Brian explained that the bench was "by no means a bleacher," as it was there simply for drivers to rest on between and after races. *Id.* at 170-71.

{¶ 10} There are no barriers around the McMillens' go-kart track, only painted edge lines. Brian McMillen explained that he purposely did not construct barriers because barriers "would just be something for a kart to hit," and would "give a much greater probability of making a car go airborn and possible flipping." *Id.* at 168, 232. Accordingly, when driving on the McMillens' go-kart track, "there are times you go off the track on a turn or you veer off for some reason or another. * * * And that happens regularly." (J. Porter Dep. at 38.) Liz McNamer noted that she "went off into the grass" the first time she drove on the track. (L. McNamer Dep. at 40, 42.) She explained that it was "safe" for a driver to "go off the track and come back on." *Id.* at 108-09. Porter noted that he had seen go-karts go off the track on the "big turns, * * * on the little turns, * * * on the straightaways," and specifically stated that he had seen go-karts go off the track "coming out that final turn into the start/stop" area. (J. Porter Dep. at 38-39; 45-46.)

{¶ 11} On the day of the incident, the Ochalls arrived with their two minor children, and two of their children's friends. The McNamers' son-in-law, Porter, was also present with his daughter, and the McNamers' granddaughter, Doe. Doe was 11 years old; the Ochall children and their friends were all 13 years old. The group met at the McNamers' house, and walked through the adjoining backyards to the McMillens' go-kart track. The McMillens were not present at the track; Sharon McMillen was at the grocery store and Mark McMillen was inside his home watching a football game.

{¶ 12} Liz McNamer gave the group instructions regarding how to operate the go-karts, telling them, "the gas was on one side, the brake was on the other, the steering wheel." (L. McNamer Dep. at 103.) Liz McNamer observed the children as they drove, noting that "[t]hey seemed to be doing pretty well. They seemed like they were able to manage going around the track." *Id.* at 106. Liz McNamer noted that she watched the children driving to make sure that no one was "at risk," and noted that she "didn't see that." *Id.* at 117.

{¶ 13} There were more people than go-karts during the 2013 event, so both the adults and the children rotated using the go-karts throughout the day. As was typical at the McMillens' track, multiple drivers drove off the track that day. Doe's go-kart came all the way off the track and went into the grass, and Porter's go-kart came partially off the track. One of the Ochall children drove off the track, "[a]ll four wheels were off the track," and Porter "had to push him out." (J. Porter Dep. at 93, 95-96.) Liz McNamer stated that she "observed that day each child went off the track at some capacity." (L. McNamer Dep. at 109.) Liz McNamer testified that, when Doe's go-kart left the track earlier in the day, she spoke to her granddaughter and "cautioned her and advised her just to be careful. The ground was pretty saturated. * * * There was water standing, so I just wanted her to be aware and, you know, just cautioned her." (L. McNamer Dep. at 129.)

{¶ 14} Mrs. Ochall was aware that there were "no barriers, there's no safety barriers" around the track. (A. Ochall Dep. at 137.) Mrs. Ochall also witnessed go-karts driving off the track on the day of the incident, and admitted that she knew "that [a go-kart] could come off the track." *Id.* at 139. Indeed, two photographs Mrs. Ochall took that day depict go-karts which had driven partially and completely off the track. (*See* A. Ochall Dep; Defs.' Exs. 3 and 4.) However, Mrs. Ochall believed that the paved area next to the start/finish line was "a safe environment. That is a safe zone." (A. Ochall Dep. at 137.) No one ever told Mrs. Ochall that the paved area was a safe zone. (*See* Dec. 4, 2014 Robert W. Ochall Dep. at 13; A. Ochall Dep. at 191.)

{¶ 15} Mrs. Ochall drove a go-kart on the day of the incident. After driving, she stood around the track taking pictures. Mrs. Ochall's camera had a telephoto lens, and there was a cup she had to put her eye up to in order to use the camera. Because she was taking pictures "one right after the other," Mrs. Ochall admitted that she was "[n]ot always" able to see what was going on around her. *Id.* at 139-40. She admitted that her vision was "[p]robably" obstructed by her camera. *Id.* at 140.

{¶ 16} After one to two hours at the track, the group decided they would hold one last race. Porter, Mr. and Mrs. Ochall, Mr. and Mrs. McNamer, and an Ochall child were all standing in the paved area adjoining the track near the start/finish line; the others participated in the race. During the second lap of the race, as Doe came into the turn which approached the start/finish area, "her hair band went over her eyes. She had

grabbed it and thrown it off to get better vision. So as she grabbed it and thrown it off, * * * she went straight through" the paved area next to the track and struck Mrs. Ochall. (J. Porter Dep. at 117.) Mrs. Ochall was standing "10-12 feet to the south of the painted edge line which delineated the marked boundary of the track surface" when the accident occurred. (Pls.' Ex. C., Apr. 9, 2013 Choya R. Hawn Acc. Reconstruction Report at 8.) Porter noted that, the cars are "hard to steer with one hand," so when Doe threw her headband "she kind of jerked as well," which caused her to veer off the track. (J. Porter Dep. at 117.) Doe confirmed these events and told her father immediately after the incident that her "headband slipped over her eyes, and she threw it out and lost control." *Id.* at 130.

{¶ 17} Doe's go-kart struck Mrs. Ochall directly and flung her into the air. When Mrs. Ochall landed, she suffered a serious spinal cord injury. The last photograph Mrs. Ochall took that day depicts Doe throwing her headband. (*See* A. Ochall Dep.; Defs.' Ex. 5.) Prior to Mrs. Ochall's injury, no one had ever been injured at the McMillens' go-kart track. (L. McNamer Dep. at 44-45.)

{¶ 18} Although each defendant filed separate motions for summary judgment, all defendants alleged that the doctrine of primary assumption of risk barred appellants' negligence claims, and that there was no evidence of reckless or intentional misconduct. The McMillens further asserted that, as they did not invite the Ochalls to their property, they could not be considered the social hosts of the Ochalls. The McNamers asserted that, as they were not the property owners, they could not be held liable for any condition on the McMillens property. MP&S and McMillen Paving, Inc. argued that McMillen Paving, Inc. was a shell corporation with no assets, and that MP&S did not design or construct the track.

{¶ 19} Appellants filed a memorandum contra the defendants' motions for summary judgment, asserting that "[n]othing occurred to alert [Mrs. Ochall] to any danger of go-karts driving into spectators in the seating area." (Apr. 14, 2015 Pls.' Memo. Contra at 8.) Appellants argued that primary assumption of the risk did not apply to the facts of this case, because the track was designed defectively and because all of the defendants had acted recklessly.

{¶ 20} Appellants supported their memorandum contra with the report of their accident reconstruction expert, Choya Hawn. Hawn observed that, "[i]n the absence of any persons afoot the original track design was in [his] opinion reasonably safe for the '***go-kart operators***.' " (Emphasis sic.) (Acc. Reconstruction Report at 13.) Hawn stated that a "reasonable solution to the safety issue for persons afoot" was to construct "a small elevated wooden platform (~7-8 inches in height) on the infield side of the start/finish/staging area." *Id.* at 16. Hawn concluded that the "failure to either provide a safe observation location or to otherwise dictate, communicate and enforce safety rules to protect guests from the potential hazard associated with spectating was unreasonable and made this an unsafe environment for persons afoot." *Id.* at 16, 18.

{¶ 21} On May 6, 2015, the court issued a decision and entry denying the McMillens' motion for summary judgment, in part, and granting the business entities' motion for summary judgment. The court concluded that, as the McNamers had asked the McMillens if they could bring the Ochalls to the McMillens property, and the McMillens had granted the McNamers permission to do so, "an implied invitation between the McMillens and Plaintiffs occurred." (May 6, 2015 Decision & Entry at 4.) As such, the court concluded that the Ochalls were the social guests of the McMillens. Regarding the entities, the court determined that McMillen Paving, Inc. had "never performed any business nor held assets, and never acted in the creation of the go-kart track," such that the company was an "inappropriate party to the suit." *Id.* at 5. Regarding MP&S, the court concluded that the company "was not employed to create or maintain the go-kart track," and that Brian McMillen was not acting in his capacity as an employee of the company when he constructed the track. *Id.*

{¶ 22} On July 31, 2015, the trial court issued a decision and entry granting the McMillens', the McNamers', and Porter's and Doe's motions for summary judgment. The court observed that go-karting is a recreational activity, and concluded that, "[s]ince the risk of being injured by a go-kart leaving the track [was] a foreseeable risk of go-kart racing on the McMillen track," the risk was "inherent to go-kart racing on a private, barrier-less backyard track." (July 31, 2015 Decision & Entry at 7-8.) As such, the court concluded that primary assumption of the risk applied to bar appellants' negligence

claims, and that appellants could only recover if the defendants acted intentionally or recklessly to cause Mrs. Ochall's injuries.

{¶ 23} The "parties agree[d] that no one acted intentionally to injure Andrea Ochall on that day." *Id.* at **8**. Accordingly, the court addressed whether any of the defendants engaged in reckless misconduct. Appellants argued that the defendants were reckless because they failed to enforce Brian McMillen's no-spectator rule. The court observed that, while Brian McMillen had a no-spectator rule when he was at the track, Brian was not the property owner, and neither the McMillens nor Brian McMillen acknowledged Brian's personal rule as a track rule. As such, the court concluded that "not allowing adult spectators at or near the track for races [was] not a rule, regulation, custom, or common practice of the track or races conducted at the McMillen track." *Id.* at **11**. The court also addressed appellants' argument that the defendants were reckless because they had not read or implemented safety guidelines from the go-kart manufacturer's or owner's manuals. The court concluded that no defendant had a duty to inform appellants about those safety guidelines.

{¶ 24} Regarding the McMillens, the court noted that, as the property owners, the McMillens had no duty to improve their track, as they only had a duty to "exercise ordinary care to prepare the property for social guests." *Id.* at **12**. Accordingly, the McMillens did not have "a duty to instruct guests on how to go-kart race or to implement any rules other than those which the family uses on their land." *Id.* at **14**. The court observed that the McMillens merely allowed their neighbors and their neighbor's guests to use their go-kart track. As such, the court did not find any evidence of reckless conduct by the McMillens.

{¶ 25} Regarding the McNamers, the court noted that the McNamers similarly "did not have a duty to instruct guests on how to drive a go-kart." *Id.* at **16**. Regarding the McNamers supervision of Doe, the court noted that Liz McNamer told her granddaughter once to slow down. The court observed that "[a] single admonishment by a grandparent in the presence of the child's parent" was "not sufficient evidence of recklessness." *Id.* at **19**. As there was no evidence indicating that the McNamers told appellants "they 'had to' stand on the adjacent asphalt area," and as Liz McNamer also stood on the adjacent asphalt area, the court could not find that the "McNamer's action of standing on the

adjacent area rose to the level of reckless required by the theory of primary assumption of the risk." *Id.* at 20.

{¶ 26} Regarding Doe, the court concluded that Doe was not reckless, "because removing a hand from the steering wheel to clear one's vision is the lesser of two evils. * * * [Doe] did not intentionally drive into the spectator area, but was unable to correct her kart's path in time to not strike Plaintiff." *Id.* at 21. Regarding appellants claim that Porter was reckless by not removing Doe from the track earlier in the day, the court concluded that, as there was no evidence demonstrating that Doe was driving recklessly throughout the day, there was no reason why Porter should have removed Doe from the track.

{¶ 27} Accordingly, the court concluded that primary assumption of the risk applied to the case, and that there was no evidence of reckless or intentional misconduct. As such, the court found the defendants entitled to summary judgment as a matter of law.

## II. ASSIGNMENTS OF ERROR

{¶ 28} Appellants appeal, assigning the following two assignments of error for our review:

> 1. THE TRIAL COURT ERRED APPLYING PRIMARY ASSUMPTION OF THE RISK TO HOLD THAT DEFENDANTS-APPELLEES WERE ENTITLED TO JUDGMENT AS A MATTER OF LAW.
>
> 2. THE TRIAL COURT ERRED IN HOLDING THAT THERE EXISTED NO GENUINE ISSUES OF MATERIAL FACT CONCERNING DEFENDANTS-APPELLEES' RECKLESS-NESS, THUS ENTITLING THEM TO JUDGMENT AS A MATTER OF LAW.

The McMillens have also filed a contingent cross-appeal, asserting the following sole, assignment of error:

> The Trial Court erred in denying in part the Motion for Summary Judgment of Appellees/Cross-Appellants Sharon McMillen and Mark McMillen and concluding that Appellants were social guests of the McMillens rather than licensees. The McMillens' assignment of error is conditional upon the Courts' ruling on the assignment of error of Appellants. If the Court overrules Appellants' assignment of error, the McMillens will withdraw the cross-appeal.

## III.  STANDARD OF REVIEW

{¶ 29} Appellate review of summary judgment motions is de novo.  *Helton v. Scioto Cty. Bd. of Commrs.*, 123 Ohio App.3d 158, 162 (4th Dist.1997).  "When reviewing a trial court's ruling on summary judgment, the court of appeals conducts an independent review of the record and stands in the shoes of the trial court."  *Mergenthal v. Star Bank Corp.*, 122 Ohio App.3d 100, 103 (12th Dist.1997).  We must affirm the trial court's judgment if any of the grounds raised by the movant at the trial court are found to support it, even if the trial court failed to consider those grounds.  *Coventry Twp. v. Ecker*, 101 Ohio App.3d 38, 41-42 (9th Dist.1995).

{¶ 30} Summary judgment is proper only when the party moving for summary judgment demonstrates that: (1) no genuine issue of material fact exists, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds could come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence most strongly construed in that party's favor.  Civ.R. 56(C); *State ex rel. Grady v. State Emp. Relations Bd.*, 78 Ohio St.3d 181, 183 (1997).

{¶ 31} When seeking summary judgment on the ground that the nonmoving party cannot prove its case, the moving party bears the initial burden of informing the trial court of the basis for the motion, and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact on an essential element of the nonmoving party's claims.  *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996).  A moving party does not discharge this initial burden under Civ.R. 56 by simply making a conclusory allegation that the nonmoving party has no evidence to prove its case.  *Id.* Rather, the moving party must affirmatively demonstrate by affidavit or other evidence allowed by Civ.R. 56(C) that the nonmoving party has no evidence to support its claims. *Id.*  If the moving party meets this initial burden, then the nonmoving party has a reciprocal burden outlined in Civ.R. 56(E) to set forth specific facts showing that there is a genuine issue for trial and, if the nonmoving party does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party.  *Id.*

## IV.    FIRST ASSIGNMENT OF ERROR – PRIMARY ASSUMPTION OF RISK

{¶ 32} Appellants' first assignment of error asserts that the trial court erred by applying the doctrine of primary assumption of the risk to the instant dispute. Appellants asserted various negligence claims against the defendants, and "in order to establish actionable negligence, one seeking recovery must show the existence of a duty, the breach of the duty, and injury resulting proximately therefrom." *Strother v. Hutchinson*, 67 Ohio St.2d 282, 285 (1981), citing *Feldman v. Howard*, 10 Ohio St.2d 189, 193 (1967). "[A] successful primary assumption of risk defense means that the duty element of negligence is not established as a matter of law." *Wolfe v. Bison Baseball, Inc.*, 10th Dist. No. 09AP-905, 2010-Ohio-1390, ¶ 21, quoting *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 432 (1996).

{¶ 33} "Ohio law recognizes three categories of assumption of the risk as defenses to a negligence claim: express, primary, and implied or secondary." *Schnetz v. Ohio Dept. of Rehab. and Corr.*, 195 Ohio App.3d 207, 2011-Ohio-3927, ¶ 21 (10th Dist.), citing *Crace v. Kent State Univ.*, 185 Ohio App.3d 534, 2009-Ohio-6898, ¶ 10 (10th Dist.). "Express assumption of the risk applies when parties expressly agree to release liability." *Crace* at ¶ 11. "Implied assumption of risk is defined as plaintiff's consent to or acquiescence in an appreciated, known or obvious risk to plaintiff's safety." *Collier v. Northland Swim Club*, 35 Ohio App.3d 35, 37 (10th Dist.1987). "Under this approach to assumption of risk, defendant owes to plaintiff some duty, but it is plaintiff's acquiescence in or appreciation of a known risk that acts as a defense to plaintiff's action." *Id.*

{¶ 34} "Under the doctrine of primary assumption of the risk, a plaintiff who voluntarily engages in a recreational activity or sporting event assumes the inherent risks of that activity and cannot recover for injuries sustained in engaging in the activity unless the defendant acted recklessly or intentionally in causing the injuries." *Morgan v. Ohio Conference of the United Church of Christ*, 10th Dist. No. 11AP-405, 2012-Ohio-453, ¶ 13, citing *Crace* at ¶ 13, citing *Santho v. Boy Scouts of Am.*, 168 Ohio App.3d 27, 2006-Ohio-3656, ¶ 12 (10th Dist.). *See also Marchetti v. Kalish*, 53 Ohio St.3d 95 (1990), paragraph one of the syllabus. "The rationale is that certain risks are so inherent in some activities that the risk of injury is unavoidable." *Crace* at ¶ 13, citing *Collier* at

37. By participating in an activity, the plaintiff "tacitly consent[s]" to the risk of injury inherent in the activity. *Id.* The test requires that: "(1) the danger is ordinary to the game, (2) it is common knowledge that the danger exists; and (3) the injury occurs as a result of the danger during the course of the game." *Santho* at ¶ 12.

{¶ 35} Thus, courts apply the doctrine of primary assumption of the risk to cases involving sporting events and recreational activities, and generally extend the doctrine to relieve liability of owners, operators, and sponsors of recreational activities. *Crace* at ¶ 12, 20. The doctrine applies regardless of whether the activity was engaged in by children or adults, or was organized, unorganized, supervised, or unsupervised. *Gentry v. Craycraft*, 101 Ohio St.3d 141, 2004-Ohio-379, ¶ 8. The doctrine also applies to spectators and participants alike. *Id.* at ¶ 10.

{¶ 36} Furthermore, when considering primary assumption of the risk, "the injured plaintiff's subjective consent to and appreciation for the inherent risks are immaterial to the analysis." *Crace* at ¶ 16, citing *Gentry* at ¶ 9. *See also Foggin v. Fire Protection Specialists, Inc.*, 10th Dist. No. 12AP-1078, 2013-Ohio-5541, ¶ 10 (noting that the plaintiff's subjective consent to the inherent risks of an activity are immaterial, because "[t]hose entirely ignorant of the risks of the activity, still assume the risk by participating in the activity"). Indeed, "primary assumption of risk requires an examination of the activity itself and not plaintiff's conduct." *Gehri v. Capital Racing Club, Inc.*, 10th Dist. No. 96APE10-1307 (June 12, 1997). *See Rees v. Cleveland Indians Baseball Co.*, 8th Dist. No. 84183, 2004-Ohio-6112, ¶ 20, quoting *Gum v. Cleveland Elec. Illuminating Co.*, 8th Dist. No. 70833 (Feb. 13, 1997) (explaining that " 'the baseball fan assumes the risk of being hit by a foul ball when he takes his place in the stands, not at the moment the foul ball comes flying his way' "). Accordingly, Mrs. Ochall's personal belief that the paved area next to the track was a safe zone is irrelevant to the primary assumption of the risk analysis.

{¶ 37} " '[O]nly those risks directly associated with the activity in question are within the scope of primary assumption of risk.' " *Horvath v. Ish*, 134 Ohio St.3d 48, 2012-Ohio-5333, ¶ 19, quoting *Gallagher* at 432. "The affirmative defense of primary assumption of the risk completely negates a negligence claim because the defendant owes no duty to protect the plaintiff against the inherent risks of the recreational activity

in which the plaintiff engages." *Morgan* at ¶ 14, citing *Crace* at ¶ 15. *See also Pope v. Willey*, 12th Dist. No. CA2004-10-077, 2005-Ohio-4744, ¶ 11. "Because of the great impact a ruling in favor of a defendant on primary assumption of risk grounds carries, a trial court must proceed with caution when contemplating whether primary assumption of risk completely bars a plaintiff's recovery." *Gallagher* at 432.

{¶ 38} The "goal" of the primary assumption of the risk doctrine "is to strike a balance between encouraging vigorous and free participation in recreational or sports activities, while ensuring the safety of the players." *Marchetti* at 99. *See also Ferrari v. Grand Canyon Dories*, 32 Cal.4th 248, 253, 38 Cal.Rptr.2d 65 (observing that the "overriding consideration in the application of primary assumption of risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature"); *Yancey v. Superior Court*, 28 Cal.4th 558, 565, 33 Cal.Rptr. 777 (noting that "[d]uty is constricted in such settings because the activity involves inherent risks which cannot be eliminated without destroying the sport itself").

{¶ 39} Whether to apply the affirmative defense of primary assumption of the risk presents an issue of law for the court to determine. *Crace* at ¶ 12, citing *Gallagher* at 435. We therefore review the trial court's application of the doctrine de novo. *Id.*

{¶ 40} Appellants contend that the trial court disregarded relevant authority when it "looked only to 'foreseeable' and 'common' risks to invoke the doctrine." (Appellant's brief, at 16.) Appellants assert that the trial court "misunderstood and misapplied Ohio law" when it held that the risks which are foreseeable and common in the course of a sport or activity are the inherent risks of the activity. *Id.* at 16-17. The trial court observed that "[a] risk is found to be ordinary or inherent to the recreational activity when it arises from conduct that is 'a foreseeable, customary part of the activity.' " (Decision & Entry at 4, quoting *Gentry* at 144.)

{¶ 41} In *Gentry* the Supreme Court of Ohio held that "where injuries stem from 'conduct that is a foreseeable, customary' part of the activity, the defendant 'cannot be held liable for negligence because no duty is owed to protect the victim from that conduct.' " *Id.* at ¶ 10, quoting *Thompson v. McNeill*, 53 Ohio St.3d 102, 104 (1990), *modified on other grounds by Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711. The court in *Gentry* noted that, "[o]bviously," in *Thompson*, the court had "applied

'primary' assumption-of-risk principles in limiting the defendant's liability." *Id.* at ¶ 11. *See Thompson* at 106 (noting that, because "[s]hanking the ball is a foreseeable and not uncommon occurrence in the game of golf," the plaintiff primarily assumed the risk of being hit by a golf ball by playing the game of golf).

{¶ 42} Under the three-part test, a danger ordinary to a game is a danger which is customary to the game. *See Santho* at ¶ 13 (observing that "[f]alling is an ordinary danger of ice-skating," and that "[c]olliding with the perimeter boards is an ordinary danger of ice rink skating"). When a danger is a foreseeable part of a game, there will be common knowledge that the danger exists. *See id.* (noting that it is "foreseeable that any time an individual, regardless of skill, steps onto ice, they risk falling or coming into contact with the barriers that set the perimeter of the skating surface"); *Cincinnati Base Ball Club Co. v. Eno*, 112 Ohio St. 175, 180-81 (1925) (noting that it is "common knowledge that in baseball games hard balls are thrown and batted with great swiftness, that they are liable to be thrown or batted outside the lines of the diamond, and that spectators in positions which may be reached by such balls assume the risk thereof").

{¶ 43} Thus, for primary assumption of the risk purposes, the risks inherent in an activity are the foreseeable, common, and customary risks of the activity. *See also Foggin v. Fire Protection Specialists, Inc.*, 10th Dist. No. 12AP-1078, 2013-Ohio-5541, ¶ 9 (noting that the "types of risks associated with the activity are those that are foreseeable and customary risks of the activity"); *Deutsch v. Birk*, 189 Ohio App.3d 129, 2010-Ohio-3564, ¶ 13 (12th Dist.). Accordingly, the trial court did not err by concluding that the foreseeable and cutomary risks of an activity are the inherent risks of the activity. *See Gentry* at ¶ 10, quoting *Thompson* at 104 (primary assumption of the risk applies to " 'conduct that is a foreseeable, customary part' of the activity").

{¶ 44} Appellants further contend that the the "trial court improperly applied the doctrine when it failed to analyze whether the risks that injured Plaintiff-Appellant were inherent, necessary or unavoidable, i.e., whether they could be eliminated." (Appellant's brief, at 17.) Appellants assert that the trial court "ignored" the "various ways" the danger to spectators "could have been eliminated." *Id.* at 23. Relying on the accident reconstruction report, appellants assert that "the 'potential' danger to spectators could have been easily eliminated by (1) moving the spectator area, (2) elevating the spectator

area by wooden deck, (3) installing simple barriers between the track and spectators, or (4) warning guests about the no-spectator rule." *Id.* Appellants, however, misconstrue the meaning of risks which "cannot be eliminated."

{¶ 45} The Supreme Court of Ohio has held that " '[t]o be covered under the doctrine, the risk must be one that is so inherent to the sport or activity that it cannot be eliminated.' " *Horvath* at ¶ 19, quoting *Konesky v. Wood Cty. Agricultural Soc.*, 164 Ohio App.3d 839, 2005-Ohio-7009, ¶ 19 (6th Dist.). In *Horvath*, the court observed that "collisions between skiers are an inherent risk of skiing," as " 'other skiers are as much a part of the risk in downhill skiing, if not more so than the snow and ice, elevation, contour, speed and weather conditions.' " *Id.* at ¶ 20, quoting *Hughes v. Seven Springs Farm, Inc.*, 563 Pa. 501, 511 (2000). *See also Morgan v. Kent State Univ.*, 10th Dist. No. 15AP-685, 2016-Ohio-3303, ¶ 25 (noting that, "by its very nature, karate, as a martial art, is an inherently dangerous activity from which the risk of harm cannot be eliminated"). To determine the risks which are so inherent in an activity that they cannot be eliminated, a court must "focus[] exclusively upon the activity itself." *Schnetz* at ¶ 28. *See also Crace* at ¶ 25.

{¶ 46} For example, in *Brumage v. Green*, 2d Dist. No. 2014-CA-7, 2014-Ohio-2552, the court observed that " '[l]osing control and flipping an ATV is a foreseeable and customary risk associated with the activity of driving or riding on an ATV.' " *Id.* at ¶ 14, quoting *Curtis v. Schmid*, 5th Dist. No. 07 CAE 11 0065, 2008-Ohio-5239, ¶ 56. The plaintiff argued that certain factors specific to the incident, including that he was driving the ATV on a public roadway, made the risks he faced "greater than are customary in the recreational activity of riding ATVs." *Id.* at ¶ 15. The court refused to address the plaintiff's incident specific arguments, because "flipping off an ATV and getting injured is a risk that is inherent in the recreational activity of riding an ATV." *Id.* at ¶ 16. The *Brumage* court observed that, " '[w]hat causes the driver to lose control is better addressed when determining whether the driver acted intentionally, [or] recklessly.' " *Id.* at ¶ 16, quoting *West v. Devendra*, 7th Dist. No. 11 BE 35, 2012-Ohio-6092, ¶ 26. *See also Morgan v. Kent State* at ¶ 22, 25.

{¶ 47} Accordingly, in analyzing the risks inherent to go-karting, we must focus exclusively on the activity of go-karting, and not on the actions or omissions of the

defendants in this case. *See Crace* at ¶ 25 (observing that, if the law treated participants differently from nonparticipants, the primary assumption of the risk analysis would shift "away from the activity and its inherent risks," and would "unnecessarily focus upon the extent of the defendant's involvement and the defendant's classification as a participant, non-participant, * * * sponsor, provider, or otherwise,* * * with no regard for the inherent risks of the activity"). Appellants' contentions regarding the things the defendants could have done to alter the McMillens' track for the benefit of spectators essentially amount to claims that the various defendants were reckless. *See Morgan v. Church of Christ* at ¶ 16.

{¶ 48} Additionally, appellants' arguments regarding the "risks to spectators" at the McMillens' track improperly attempts to shift the focus of the analysis away from the risks inherent in the activity. (Appellant's brief, at 20.) Because the primary assumption of the risk analysis focuses on the risks inherent in the activity at issue, spectators and participants are treated the same. Indeed, "spectators as well as participants 'must accept from a participant conduct associated with that sport' or activity." *Gentry* at ¶ 10, quoting *Thompson* at 104. *See also Taylor v. Mathys*, 3rd Dist. No. 14-04-32, 2005-Ohio-150, ¶ 10, citing *Gentry* at ¶ 6 (noting that primary assumption of the risk's "limitation on liability extends to the spectators of a recreational activity as well as the participants"); *Crace* at ¶ 25. " '[T]hose entirely ignorant of the risks of a sport, still assume the risk * * * by participating in a sport or simply by attending the game.' " *Gentry* at ¶ 12, quoting Gilles, *From Baseball Parks to the Public Arena*: Assumption of the Risk in Tort Law and Constitutional Libel Law, 75 Temple L.Rev. 231, 236 (2002).

{¶ 49} Focusing on the activity at issue herein, we observe that go-karting is a recreational activity involving motorized go-karts which are propelled forward around a racetrack by a driver. During a race, a go-kart driver will attempt to drive their go-kart past the other go-karts in the race in order to be the first go-kart to cross the finish line. The joy of go-karting derives from attempting to maintain control over one's go-kart while maneuvering, at speed, around the go-kart track and the other go-karts present on the track. Accordingly, the inherent risks of go-karting include running into other go-karts on the track, or deviating from the track and running into any object present around the track. *See Loewenthal v. Catskill Funland*, 237 A.D.2d 262, 263, N.Y.S.2d

169 (1997) (where the plaintiff's "go-kart veered off its intended course, striking the wall in the pit area head on," the court observed that, "[i]n riding the go-cart, the plaintiff * * * assumed the risks inherent in the activity," which included that the "go-cart would bump into objects"); *Garnett v. Strike Holdings LLC*, 131 A.D.3d 817, 820, N.Y.S.1st 786 (2015) (noting that "the operator of the track does not have a duty to protect the go-kart rider from the inherent and foreseeable risk of being bumped by another go-kart"). *Compare Jussila v. United States Snowmobile Assn.*, 556 N.W.2d 234, 237 (Minn.App.1996) (noting that "a snowmobile takes on a more dangerous character when operated on a racetrack by competitors attempting to win races").

{¶ 50} Accordingly, the risk that a go-kart may veer off the track and strike any object present nearby is a risk inherent to go-karting. As such, Mrs. Ochall assumed that risk in the primary sense when she stood 10 to 12 feet away from the McMillens' go-kart track while a go-kart race was in process.

{¶ 51} Appellants assert that the trial court erred "by conflating the duty analysis under primary assumption of the risk with the social host duty of care in premises liability cases." (Appellant's brief, at 27.) The trial court noted appellants' argument that "a risk is not inherent if it can be eliminated with due care," but concluded that, because "[d]efendants, as social hosts, did not have an additional duty to make adjustments to the private, residential track, * * * the risk in question [was] a risk inherent to go-kart racing on a private, barrier-less backyard track." (Decision & Entry at 5, 7-8.) Appellants contend that the trial court's analysis improperly mixed "duty with breach." (Appellant's brief, at 27.) We agree.

{¶ 52} The trial court erred in its primary assumption of the risk analysis because it failed to ascertain the risks inherent in the activity of go-karting. Instead, the trial court wrongly focused on the defendants, and the duty they owed to appellants, rather than focusing on the activity at issue. *See Schnetz* at ¶ 30 (finding that the trial court erred by concluding that primary assumption of the risk did not apply "to inmate claims against a prison because a prison owes a duty of care to inmates in its custody and control," as such a "holding shift[ed] the focus of the analysis away from the activity and its inherent risks and improperly focuse[d] upon the extent of the defendant's involvement and the defendant's classification").

{¶ 53} Although the trial court erred by considering the defendants' duty under the primary assumption of the risk analysis, this error does not amount to reversible error. Pursuant to our de novo review, we have determined that an inherent risk of go-karting is the risk that a go-kart will deviate from its intended course upon the track and strike any object which may be present around the track. As such, absent evidence of reckless or intentional conduct, primary assumption of the risk applies to the facts of this case and defeats appellants' negligence claims. Accordingly, we have reached the same result as the trial court, albeit for different reasons. *See Phillips v. Dayton Power & Light Co.*, 93 Ohio App.3d 111, 115 (2d Dist.1994) (noting that, since the reviewing court must independently determine, as a matter of law, whether summary judgment was properly granted, "[a] summary judgment based on a legally erroneous analysis of the issues must be affirmed if the appellate court independently determines that upon the record summary judgment should have been rendered as a matter of law, albeit for different reasons").

{¶ 54} Appellants assert that the trial court disregarded the two Ohio go-karting cases, *Goffe v. Mower*, 2d Dist. No. 98-CA-49 (Feb. 5, 1999) and *Reed v. Cassidy*, 3d Dist. No. 2-01-36 (Apr. 10, 2002), in reaching its summary judgment decision. The trial court noted the cases, but correctly found the cases inapplicable to the present dispute. (*See* Decision & Entry at 5-6.)

{¶ 55} In *Reed* the plaintiff was injured at a charity go-kart race being held on city streets. The race organizers had placed a four-foot high fence and bales of hay around the race perimeter to separate the sidewalk from the racetrack. The plaintiff was "initially watching the race from a spectator area," but had moved to another area to watch the race, which was still "protected by the orange fencing" but had "fewer hay bales." *Id.* Two go-kart drivers collided during the race, causing one go-kart to veer off the track and strike the plaintiff. The court stated that it was "not convinced that injury to a spectator [was] the kind of risk so inherent to the sport of go-kart racing that the appellant could be deemed to have consented to it." *Id.* The court noted that the plaintiff "testified that she observed other accidents during go-kart races and that there had, in fact, been several other accidents on the day she was hit." *Id.* The court concluded that simply observing other go-karts run into each other did "not mean that injury to spectators as a result of

karts leaving the track [was] inherent to racing," but stated that it "raise[d] a question of fact as to whether such risk was obvious to appellant." *Id.*

{¶ 56} As *Reed* is a decision from the Third District Court of Appeals, it holds no precedential value in this district. Furthermore, as the *Reed* court failed to engage in a proper primary assumption of the risk analysis, we do not find the decision persuasive. *Reed* did not attempt to ascertain the risks inherent to the activity of go-karting. Instead, the court simply concluded that injury to spectators was not an inherent risk of go-karting. In so concluding, the court treated spectators differently from participants, in violation of *Gentry*. The *Reed* court also inappropriately considered the plaintiff's subjective understanding of the risk, in further violation of *Gentry*.

{¶ 57} Unlike the present case which concerns a private, free, backyard go-kart track, in *Goffe* the plaintiff was a business invitee at a commercial go-kart track. The plaintiff was injured exiting her go-kart at the end of the ride when another driver accidently accelerated and "struck a parked go-cart in the off-loading area of the track," which then "struck Ms. Goffe in the leg." *Id.* The plaintiff alleged defective design had caused her injury because, at the end of the ride, a gate would funnel the go-karts "into a confined pit area so that a runaway go-cart had no option but to strike go-carts in the unloading area." *Id.* The court observed that "[o]ne who rides an amusement device assumes the ordinary risks inherent in the ride, insofar as those risks are obvious and necessary, but only so long as the device is properly designed and the operator has used proper care in its construction and operation." *Id.*, citing *Pierce v. Gooding Amusement Co.*, 55 Ohio Law Abs. 556 (1949). The court concluded that the business had breached its "duty of ordinary care to Ms. Goffe by desiging an amusement ride which created an unreasonable danger that the rider would be injured while exiting the ride but before reaching a place of safety." *Id.*

{¶ 58} Relying on *Goffe*, appellants contend that primary assumption of the risk cannot apply in this matter, because defendants "enhanced the unusual risk to spectators by operating a defective track." (Appellant's brief, at 23.) Appellants assert that defendants "failed to design, build and operate the track to account for spectator safety by, among other steps, moving the spectator area inside the track and elevating it." *Id.* at 24. Appellants argue that the track was defective because defendants "built and maintained a

'short chute' at the final high-banked turn to create faster go-kart speeds approaching the spectator area." *Id.* However, there is no evidence in the record indicating that either the short-chute or the high-banked turn created faster go-kart speeds, or that these aspects of the track caused the accident.

{¶ 59} Brian McMillen explained that, in 2010-11, he "raised the elevation" on the curve approaching that start/finish area in order to "control flooding from the pond and the ground water." (B. McMillen Dep. at 135.) The alteration resulted in the track "dropping three or four inches over that 30-40 feet" as a kart approached the straightaway into the start/finish line. *Id.* at 149. Brian referred to the straightaway as a "short chute," explaining that a "short chute" is just a "small piece of straightaway between two turns." *Id.* at 150. Notably, Brian confirmed that this alteration did not affect a driver's "ability to change speed or how they had to maneuver that part of the track." *Id.* at 149.

{¶ 60} Hawn concluded that "it was mathematically possible for a kart to be driven successfully through the high-banked curve at the south end of the track" approaching the start/finish area "at full (maximum) speed," and explained that "[t]he laws of Newtonian physics dictate that if a kart were to exceed the critical speed of the high-banked curve or fail to maintain a traversable line through the curve, the kart will break tracation and likely slide towards the outside of the curve beyond the apex." (Acc. Reconstruction Report at 10, 13. ) Hawn stated that Doe's go-kart was travelling between 18 to 25 miles per hour when it struck Mrs. Ochall, "which was consistent with the critical speed calculations for the kart traversing the high-banked curve." *Id.* at 11. Thus, Doe did not exceed the critical speed of the high-banked curve. Although Hawn referred to the high-banked curve as the "fastest curve of the track," he did not find that the curve created unreasonably fast go-kart speeds or that the curve would cause a driver to lose control of their go-kart. *Id.* at 13.

{¶ 61} Indeed, Hawn concluded that the "design, layout, construction and overall environment of the track facility (with the generous clear zone) was reasonably safe for the 'operators of the karts.' " *Id.* at 17. Hawn also stated that the "the original track design was in [his] opinion reasonably safe for the '***go-kart operators***.' " (Emphasis sic.) *Id.* at 15. Thus, appellants own expert concluded that the design of the track was safe.

Appellants have failed to demonstrate a genuine issue of material fact regarding whether the track was designed defectively.

{¶ 62} Appellants' contention that the McMillens' track was defectively designed because there was no infield, elevated, spectator platform, does not amount to an argument that the track was designed defectively. An elevated viewing platform would not be part of the track itself; rather, it would be a separate structure near the track. Appellants' contention that defendants should have constructed a viewing platform for spectators, or taken other actions for spectators, do not allege that the track itself was designed defectively, but are essentially claims that the defendants were reckless by failing to build a spectator platform.

{¶ 63} Based on the foregoing, we find that Mrs. Ochall primarily assumed the risk of injury when she stood 10 to 12 feet away from the McMillens' go-kart track. Appellants' first assignment of error is overruled.

## V.     SECOND ASSIGNMENT OF ERROR - RECKLESSNESS

{¶ 64} Appellants' second assignment of error asserts that the trial court erred in finding no genuine issues of material fact regarding defendants' recklessness.

{¶ 65} An actor's conduct is reckless when the actor " 'does an act or intentionally fails to do an act which it is his duty to the other to do, knowing or having reason to know of facts which would lead a reasonable man to realize, not only that his conduct creates an unreasonable risk of physical harm to another,' " but also " 'that such risk is substantially greater than that which is necessary to make his conduct negligent.' " *Marchetti* at 96, fn. 2, quoting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965). "What constitutes an unreasonable risk under the circumstances of a sporting event must be delineated with reference to the way the particular game is played, *i.e.,* the rules and customs that shape the participants' ideas of foreseeable conduct in the course of a game." *Thompson* at 105.

{¶ 66} Thus, "[i]f the rules of a sport allow conduct intended to harm another player, as they do in boxing or football, for example, it follows that those same rules allow behavior that would otherwise give rise to liability for recklessness." *Id*. Conversley, "any conduct which is characterized by the strong probability of harm that recklessness entails, and which occurs outside the normal conduct and customs of the

sport, may give rise to liability." *Id.* In assessing recklessness, courts must recognize the "inverse relationship between duty and dangerousness," as the " '*quid pro quo* of an "assumed greater risk" is a diminished duty.' " *Id.*, quoting *Hansen v. Kynast*, 38 Ohio App.3d 58, 64 (5th Dist.1987).

{¶ 67} Appellants assert that the trial court "wrongly construed evidence regarding Defendants' failure to warn Andrea Ochall about the track builder Brian McMillen's design and rule prohibiting spectators in a light most favorable to [plaintiffs]." (Appellant's brief, at 34.) Appellants assert that, construing the evidence in their favor, there are genuine issues of material fact regarding whether McMillens and/or McNamers disregarded Brian McMillen's rule and "knowingly failed to warn or inform Andrea Ochall about the Brian McMillen's design and policy." *Id.* at 38.

{¶ 68} As noted above, Brian McMillen testified that he did not design the track to account for spectators. (B. McMillen Dep. 169.) Brian explained that he "rarely" had spectators at the track, but that when he did, he told them to "[s]tay up in the barn." *Id.* at 172, 175. However, Brian also did not enforce his no-spectator rule when he was at the track. Brian noted that when the track was first built his "dad may come out or one of [his] friends may come out and stand somewhere in that vicinity," of the paved area next to the start/finish line, "and watch us turn a couple laps." *Id.* at 172. Brian stated that he had never kicked any spectator of the paved area next to the start/finish line. *Id.* at 182-83.

{¶ 69} Sharon McMillen noted that Brian told her "[a] couple of years ago" that he had a no-spectator rule when he was at the track, but she clarified that he never told her that the track wasn't designed for spectators. (Feb. 10, 2015 Sharon McMillen Dep. at 104-05. Sharon noted that, when she was out at the track, she would stand "[u]sually in the grass out by the corner where the bench sits," explaining that's "just where we stand." *Id.* at 100, 102. Sharon stated that she previously stood on the paved area next to the start/finish line when Brian was also present at the track, and that he never told her to move from that location. *Id.* at 130.

{¶ 70} Indeed, for adult spectators at the McMillens' go-kart track, there "was no rule" regarding where they had to stand. *Id.* at 108-09. Sharon McMillen noted, "[t]here's seven acres they can stand on. They can stand anywhere." (S. McMillen Depo. 108.) Sharon believed it was safe for people to stand on the paved area next to the

start/finish line at the track, "[a]s long as they're watching what's going on." *Id.* at 102, 108.

{¶ 71} The McMillens, as the property owners who granted the McNamers permission to bring the Ochalls upon their land, were the implied social hosts of the Ochalls. *See Estill v. Waltz*, 10th Dist. No. 02AP-83, 2002-Ohio-5004, ¶ 32 (noting that, to be classified as a social guest, "the evidence must show the host extended to the guest an actual invitation, express or implied"). As social hosts, the McMillens owed their guests the following duties: (1) to exercise ordinary care not to cause injury to their guests by any act of the host or by any activities carried on by the host while the guest is on the premises, and (2) to warn the guest of any condition of the premises which is known to the host and which one of ordinary prudence and foresight in the position of the host should reasonably consider dangerous, if the host has reason to believe that the guest does not know and will not discover such dangerous condition. *Scheibel v. Lipton*, 156 Ohio St. 308 (1951), paragraph three of the syllabus. Accordingly, the McMillens had a duty to warn the Ochalls of any dangerous condition on their premises which the McMillens had reason to believe the Ochalls did not know about and could not discover.

{¶ 72} As the lack of barriers around the McMillens' track was readily apparent, there was no dangerous condition about the track which the McMillens should have had any reason to believe the Ochalls did not know about or could not discover. Indeed, Mrs. Ochall saw go-karts driving off the track throughout the day, and admitted that she knew that there "was no barrier in front of [her] * * * to protect [her] from getting hit by a car if it left the track." (A. Ochall Dep. at 172-73.) Accordingly, the McMillens had no duty to warn appellants about Brian McMillen's personal track rule. As such, viewing the evidence in a light most favorable to the Ochalls, we are unable to find a genuine issue of material fact regarding whether the McMillens intentionally failed to inform the Ochalls about Brian's rule when they had a duty to do so. *Marchetti* at 96, fn. 2, quoting 2 Restatement of the Law 2d, Section 500, at 587 (1965). As such, the McMillens were not reckless by failing to inform appellants about Brian's rule.

{¶ 73} Regarding the McNamers, appellants assert that the McNamers were reckless because they "knew of [Brian McMillen's] prohibition and failed to inform guests." (Appellant's brief, at 36.) Liz McNamer stated that she could not recall if Brian

McMillen ever told her about his no-spectator rule, noting that "[h]e could have told [her] husband, but * * * [she didn't] recall." (L. McNamer Dep. at 66.)

{¶ 74} During Brian McMillen's deposition, counsel asked him if he ever told "people, including the McNamers or anybody, that if you're not driving a go-kart, then you better not be standing anywhere on this track, whether it's the access road, sitting on that bench, anywhere on this asphalt period?" (B. McMillen Dep. at 175.) Brian responded, stating:

> Absolutely. Absolutely we've talked about that with the McNamers, with Michael, their son, with my brother, myself, my dad, we've all discussed the common sense rules of the road that we're going to follow out here on this go-kart track. Absolutely.
>
> * * *
>
> And, again, you know, it's not like we sat down and said, hey, let's write a rule book for the track. I'm talking about general guys hanging out in the garage, garage talk, hey, these are the rules of the road we're going to follow. Again, we're not putting together a commercial facility here. We're going — we're putting together a little backyard toy here.

*Id.* at 175-76.

{¶ 75} When asked if he told the McNamers that he "didn't build this track for there to be any bystanders. And that if you're not racing, no one is allowed to be standing around watching people racing or in go-karts going around the track on any part of this asphalt," Brian stated "[t]hat's just generally speaking what we have always gone with." *Id.* at 177.

{¶ 76} Liz explained that everytime she had ever been to the track people would be standing in the paved area adjacent to the start/finish line. (L. McNamer Dep. at 67.) Liz also always stood in that area and believed it was safe to stand there as long as "you're observing and — and paying attention and watching what's occurring." *Id.* at 56-57. Porter similarly testified that whenever he had been to the track, people always stood on the asphalt near the start/finish line. (J. Porter Dep. at 44.)

{¶ 77} To determine whether the McNamewrs were reckless in failing to inform the Ochalls about Brian McMillen's personal track rule, we ask whether the McNamers

intentionally failed to inform the Ochalls about Brian's rule when they had a duty to do so. *Marchetti* at 96, fn. 2, quoting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965). As noted, primary assumption of the risk " 'relieves a recreation provider from any duty to eliminate the risks that are inherent in the activity.' " *Lykins v. Fun Spot Trampolines*, 172 Ohio App.3d 226, 2007-Ohio-1800, ¶ 34 (10th Dist.), quoting *Whisman v. Gator Invest. Properties, Inc.*, 149 Ohio App.3d 225, 236 (1st Dist.2002).

{¶ 78} The parties do not direct us, and our independent research has failed to produce, an Ohio case delineating the duty which a non-landowner, sponsor or organizer of a free activity owes to the participants of the activity. Courts from other jurisdictions, however, have held that "operators, sponsors and instructors in recereational activities posing inherent risks of injury have no duty to eliminate those risks, but do owe participants the duty not to unreasonably increase the risks of injury beyond those inherent in the activity." *Nalwa v. Cedar Fair, L.P.*, 55 Cal.4th 1148, 1162, 150 Cal.App.3d 551 (2012).[1] *See also Saville v. Sierra College*, 133 Cal.4th 857, 872, 36 Cal. Rptr. 515 (2005) (noting that an "organizer of an activity is under a duty not to increase the risk of injury inherent in the activity"); *Estate of McNeil v. FreestyleMX.com, Inc.*, 177 F.Supp.3d 1260 (S.D.Cal. 2016) (noting that the "organizer and promoter of the freestyle motocross event" owed the plaintiff a limited duty of care, "breached only if they increased the risk beyond that which is inherent to the activity itself"); *Amezcua v. Los Angeles Harley-Davidson, Inc.*, 200 Cal.4th 217, 232, 234, 132 Cal. Rptr.3d 567 (2011) (concluding that the sponsor of the activity, had not "increased the inherent danger of riding in an organized motorcycle ride," because "traffic slowing and other drivers not paying

---

[1] In *Nalwa* the plaintiff argued that sponsors of recreational activities should owe a greater duty to participants. The court disagreed, holding as follows:

> A rule imposing negligence duties on sponsors, organizers and operators of recreational activities would encompass not only commercial companies like defendant but also noncommercial organizations without extensive budgets or paid staff. Such groups might not easily afford insurance to cover injuries that are inherent risks of the activity; nor could they readily collect large fees from participants to cover that cost. The primary assumption of risk doctrine helps ensure that the threat of litigation and liability does not cause such recreational activities to be abandoned or fundamentally altered in an effort to eliminate or minimize inherent risks of injury.

*Nalwa* at 1162.

attention are inherent risks of riding in an organized motorcycle ride on public highways," and to close down the freeway in order to eliminate these risks "would alter the parade-like nature of riding in a motorcycle procession on a public highway").

{¶ 79} Accordingly, as the organizer of the go-karting event that day, the McNamers owed appellants the duty to not increase the risk of harm beyond the risks inherent in the activity. Failing to inform appellants about Brian McMillen's rule did not increase the risks inherent in the activity of go-karting, as it did not increase the risk that go-karts would crash into one another, or that a driver would lose control of their go-kart and deviate from the track. Accordingly, the McNamers did not have a duty to inform the Ochalls about Brian McMillen's rule. Construing the evidence in appellants favor, we find no evidence demonstrating that the McNamers intentionally failed to inform the Ochalls about Brian's rule when they had a duty to do so. Accordingly, appellants have failed to demonstrate that the McNamers were reckless by failing to inform the Ochalls about Brian McMillen's rule.

{¶ 80} Appellants next assert that the trial court "ignored factual issues regarding Defendants' concealing the danger from Andrea Ochall by installing a bench to entice her to congregate on the paved area next to the track not designed for spectators." (Appellants' brief, at 38-39.)  Mr. McMillen had placed a light, moveable, park style bench on the back of the paved area adjoining the start/finish line.  (S. McMillen dep. at 106.) Brian McMillen explained that the bench was for drivers to sit on following a race, noting that, after a race, "you're tired, your back hurts, your legs are sore, you're sweating. * * * A guy will sit on that bench and relax for a minute." (B. McMillen Dep. at 170.)

{¶ 81} Sharon McMillen agreed with counsel that someone might think "if there's a bench around, that that may be a safe place to be because there's a bench where you could sit." (S. McMillen Dep. at 106.)  However, there is no evidence indicating that the McMillens placed the bench there to "entice" people to congregate in that area. More importantly, the bench did not conceal any danger from appellants. The bench did not obscure appellants' ability to see the barrier-less nature of the track or the go-karts driving off the track. There also was no evidence indicating that Mrs. Ochall ever sat on the bench; rather, the evidence indicated that Mrs. Ochall "moved around quite a bit to

take photographs." (J. Porter Dep. at 107.) *Compare Kacsmarik v. Lakefront Lines Arena*, 8th Dist. No. 95981, 2011-Ohio-2553, ¶ 10, 13 (concluding that the "bench was not the proximate cause of [plaintiff's] injuries," as the plaintiff was not "sitting on the bench when she was injured" as she had "left the bench, [and] opened the ice rink door").

{¶ 82} Construing the evidence in appellants' favor, we cannot find that the McMillens knew or had reason to know of facts which would have lead them to realize that placing a bench near their go-kart track created an unreasonable risk of physical harm to another, or amounted to conduct substantially greater than negligent conduct. Simply placing a bench by the track did not create an unreasonable risk of physical harm to others, as the bench did not obsecure anyone's ability to appreciate the barrier-less nature of the go-kart track.

{¶ 83} Appellants also state that Hawn concluded that Brian McMillen's 2010-11 alteration to the track, "enhanced the danger to spectators by creating greater risk go-karts would lose control."  (Acc. Reconstruction Report at 13-14.)  (Appellant's brief, at 41.) Appellants assert that "[t]his remodeling and the enhanced risk were not known to Andrea Ochall, whereas McMillens knew that they had made the track faster for go-karts approaching the spectator area where they had placed the bench." (Appellant's brief, at 41.) Although appellants do not directly argue that the McMillens acted recklessly by altering their track, we observe that the McMillens were not reckless in this regard, as there is no evidence linking the 2010-11 alteration to an increased risk that a driver would lose control of their go-kart.

{¶ 84} Hawn stated that the paved area next to the start/finish line, and "just beyond the exit to the fastest curve of the track," would be a danger zone to persons afoot, but only "if a driver should experience such a loss of control and deviate from the track." (Acc. Reconstruction Report at 13.)  Similarly, Hawn stated that the paved area next to the track was dangerous for spectators, but only in the event that "a kart deviated from the track, at speed, due to driver loss of control in the curve." *Id.* at 14.  Thus, Hawn's opinion that the paved area next to the start/finish line was unsafe for spectators was based on if a driver should lose control of their go-kart. Hawn did not find that the elevation of the curve, or that the straightaway itself, would cause a driver to lose control of their go-kart.

Brian confirmed that the 2010-11 alteration did not affect a driver's "ability to change speed or how they had to maneuver that part of the track." (B. McMillen Dep. at 149.)

{¶ 85} Furthermore, Hawn opined, and the record supports, that it was Doe's act of "discarding an unwanted headband" which caused her to fail to "maintain steering control [which] was a significant causative factor" of the accident. (Acc. Reconstruction Report, 14-15.) Thus, it was Doe's act of removing her hand from the steering wheel to remove her headband from her face, and not the elevation of the high-banked curve, which caused the accident.

{¶ 86} Appellants also state that "an easy, inexpensive precaution" for the McMillens was to "relocate the spectator area to the inside of the track and raise the elevation where their guests stood." (Appellant's brief, at 41.) Appellants do not directly assert that the McMillens acted recklessly by failing to construct an elevated spectator platform. Regardless, the McMillens were not reckless by failing to construct a spectator platform, because they had no duty to do so. " 'There is no duty on the part of the host to reconstruct or improve the premises for the purpose of making his house more convenient or more safe for those accepting his hospitality, gratuitously extended. The guest assumes the ordinary risks which attach to the premises.' " *Scheibel* at 315, quoting 38 American Jurisprudence 778, Section 117.

{¶ 87} Appellants next assert that defendants concealed the "danger by failing to educate themselves about safety or warn guests of known danger." (Appellant's brief, at 43.) Appellants observe that Sharon McMillen instructed drivers, "don't be bumping into anybody," but assert that she was reckless because she did not know how fast the go-karts traveled, wasn't aware of the go-kart's maintenance schedule, and did not follow the go-kart manufacturer's height or age restrictions. *Id.* at 44-45. Appellants similarly assert that Liz McNamer was reckless because she did not know the make or model of the go-karts, did not know the go-kart manufacturer's age or height restrictions, and did not know how fast the go-karts traveled. *Id.* at 45-46.

{¶ 88} Appellants, however, fail to explain what any of these facts have to do with the accident. The accident did not result from unsafe go-kart operation; it occurred because Doe's headband slipped into her eyes. *See Thompson v. Park River Corp.*, 161 Ohio App.3d 502, 2005-Ohio-2855 (1st Dist.), ¶ 43 (observing that, although the plaintiffs

"presented evidence that the handrail was deteriorating and that a 1 to 50 instructor-to-student ratio was too high to be considered safe, they presented no evidence that either of these factors played even the slightest role in causing Eric's injury"). Appellants fail to establish a genuine issue of material fact regarding whether the defendants intentionally failed to educate themselves about go-kart safety when they had a duty to do so, or that they intentionally failed to warn appellants about the dangers of go-karting when they had a duty to do so. *Marchetti* at 96, fn. 2, quoting 2 Restatement of the Law 2d, Torts, Section 500, at 587 (1965). Accordingly, the record fails to demonstrate that any of the defendants acted recklessly by failing to educate themselves about safe go-kart operation or by failing to warn guests of the dangers of go-karting.

{¶ 89} Appellants lastly assert that the trial court "construed evidence regarding [Doe's] driving and supervision of her by Liz McNamer and James Porter in a light most favorable to Defendants." (Appellant's brief, at 48.) Appellants note that, earlier in the day before the accident, Doe drove off the track, and that "[o]ther children came partially off the track as well." *Id.* at 48. McNamer went and spoke to Doe after she drove off the track, and "cautioned her and advised her to be careful." (L. McNamer Dep. at 129.) McNamer explained that "all the children had went off" the track that day, but that she only spoke to Doe because she was Doe's "grandparent." *Id.* at 131. McNamer noted that, "[n]o one else said anything to me that anyone was driving reckless or that [Doe] wasn't in control." *Id.* Porter testified that Doe's driving that day was "[t]ypical for past driving and typical of the driving of all of the other children who were racing that day." (J. Porter Dep. at 105.) Porter stated that he never told his daughter, or anyone, to slow down. *Id.* at 152.

{¶ 90} Mrs. Ochall testified that Doe "had been asked numerous times to slow down and watch her speed. * * * She was warned by her father, by Liz." (A. Ochall Dep. at 27.) Mrs. Ochall characterized Doe's driving as "out of control," because she had "gotten off the track" and "was just driving aggressively." *Id.* at 45-46. Mr. Ochall stated that Doe was "driving aggressively," by "[p]assing other cars." (R. Ochall Dep. at 53.) However, Mrs. Ochall explained that she took no precautions for her own personal safety in light of Doe's allegedly aggressive driving, because she "felt that [Doe's] grandmother and father addressed the behavior with [Doe]." (A. Ochall Dep. at 48.)

{¶ 91} Accordingly, construing the evidence in appellants' favor, Porter and McNamer watched the children driving, all the children drove off the track that day, and McNamer and Porter cautioned Doe about her driving. Although Mrs. Ochall characterized Doe's driving as aggressive, she felt that McNamer and Porter adequately addressed Doe's behavior by speaking to her. Appellants fail to demonstrate how Porter or McNamer engaged in conduct which was substantially greater than negligent conduct by keeping an eye on Doe and cautioning her.

{¶ 92} Appellants assert that the trial court "ignored the Ochalls' testimony that [Doe] was driving aggressively." (Appellant's brief, at 50.) The trial court, however, did not ignore this evidence. The court noted appellants' contention that Doe was driving aggressively by "passing other karts and veering off the track." (Decision & Entry at 20.) The trial court observed that Mr. Ochall admitted that "he passed other karts while driving on the track that day," and that Doe "was not the only child to veer off the track that day, as one of [apppellants'] children also veered off the track while driving." *Id.* at 21. The court concluded that there was no evidence that Doe's "actions prior to the accident amounted to aggressive driving." *Id.*

{¶ 93} Indeed, appellants fail to make any connection between Doe's allegedly aggressive driving and the accident. The record indicates only that it was an unfortunate slip of Doe's headband, and Doe's attendant need to remove her hand from the wheel in order to remove the headband from her face, which caused the accident. There is nothing in the record indicating that Doe's alleged aggressive driving caused the accident. *See Thompson v. Park River Corp.*, 161 Ohio App.3d 502, 2005-Ohio-2855, ¶ 43 (1st Dist.).

{¶ 94} Finally, Doe's act of removing her headband from her line of vision did not amount to reckless conduct. Doe did not remove the headband with any conscious choice of action, or with knowledge that doing so would cause her go-kart to jerk, veer off the track, and strike Mrs. Ochall. *See West v. Devendra,* 7th Dist. No. 11 BE 35, 2012-Ohio-6092, ¶ 37, quoting 2 Restatement of the Law 2d, Torts, Section 500, Comment g (1965) (noting that "reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man").

{¶ 95} Because appellants fail to establish any genuine issues of material fact regarding whether the defendants engaged in reckless misconduct, appellants' second assignment of error is overruled.

## VI.  CONCLUSION

{¶ 96} The incident at the McMillens' go-kart track which caused Mrs. Ochall's injury was, unquestionably, a terrible and tragic accident. However, every tragic accident does not result in tort liability. Because Mrs. Ochall primarily assumed the risk of injury when she stood 10 to 12 feet away from the McMillens' go-kart track, and no defendant engaged in reckless or intentional misconduct, the trial court properly granted the defendants' motions for summary judgment. Having overruled appellants' first and second assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.  As we have overruled the appellants' assignments of error, the McMillens withdraw their assignment of error on cross-appeal.

*Judgment affirmed.*

SADLER, J., concurs.
DORRIAN, P.J., concurs in and part dissents in part.

DORRIAN, P.J., concurring in part and dissenting in part

{¶ 97} I respectfully concur in part and dissent in part.

{¶ 98} I concur with the majority that primary assumption of the risk requires an examination of the recreational activity or sport itself.  For this reason, and pursuant to *Gentry v. Craycraft*, 101 Ohio St.3d 141, 2004-Ohio-379, ¶ 10, I also agree with the majority that spectators and participants are to be treated the same and appellants' arguments regarding the "risks to spectators" improperly attempt to shift the focus of the analysis away from the risks inherent in the activity.  (Lead opinion at ¶ 48.)  Consistent with this, I concur with the majority and am not persuaded by the Third District Court of Appeals' decision in *Reed v. Cassidy*, 3d Dist. No. 2-01-36 (Apr. 10, 2002).

{¶ 99} I concur with the majority that the trial court erred when it conflated the duty analysis under primary assumption of the risk with the social host duty of care under premises liability.

{¶ 100}         I concur with the majority that the trial court did not err when it observed that "[a] risk is found to be ordinary or inherent to the recreational activity when

it arises from conduct that is 'a foreseeable, *customary* part['] of the activity." (Emphasis added.)  (July 31, 2015 Decision at 4, quoting *Gentry* at ¶ 10.)  (Lead opinion at ¶ 43.)  However, I would find further, notwithstanding the trial court's correct legal statement, that the trial court erred by concluding that "foreseeable risks are inherent risks of recreational activities" and in not conducting the additional analysis of whether the risk is ordinary or customary to the game. (July 31, 2015 Decision at 7.)  Given this court's three part test in *Santho v. Boy Scouts of Am.*, 168 Ohio App.3d 27, 2006-Ohio-3656 (10th Dist.), which requires that in order to be considered inherent, a risk be both ordinary and foreseeable, I would interpret the term "customary" in this context as "ordinary." To interpret "customary" as "common" or "foreseeable" would merge the doctrines of primary and implied assumption of the risk.

{¶ 101}      I concur with the majority that the Supreme Court of Ohio has held that " '[t]o be covered under the * * * doctrine, the risk must be one that is so inherent to the sport or activity that it cannot be eliminated.' "  *Horvath v. Ish*, 134 Ohio St.3d 48, 2012-Ohio-5333, ¶ 19, quoting *Knoesky v. Wood Cty. Agricultural Soc.*, 164 Ohio App.3d 839, 2005-Ohio-7009, ¶ 19 (6th Dist.).  (Lead opinion at ¶ 45.)  I would note further that contrary to appellees' suggestion that courts do not typically conduct a detailed analysis of whether a risk cannot be eliminated, a survey of Tenth District case law reveals that this court adheres to this requirement.  "If the activity is one that is inherently dangerous and from which the risks cannot be eliminated, then a finding of primary assumption of risk is appropriate."  *Gehri v. Capital Racing Club, Inc.*, 10th Dist. No. 96APE10-1307 (June 12, 1997) (finding the plaintiff's "injuries occurred as a result of a commonly known danger ordinary to the sport of thoroughbred horse racing").  *See also Morgan v. Kent State Univ.*, 10th Dist. No. 15AP-685, 2016-Ohio-3303, ¶ 13, 15, 25 (noting that, "by its very nature, karate, as a martial art, is an inherently dangerous activity from which the risk of harm cannot be eliminated"); *Crace v. Kent State Univ.*, 185 Ohio App.3d 534, 2009-Ohio-6898, ¶ 35 (10th Dist.) (noting that in cheerleading, "the risk [of injury] is forever present and may only be reduced to manageable levels. Manageable risks are nevertheless risks. It necessarily follows that the risk of injury is incapable of being completely eliminated"); *Morgan v. Ohio Conference of the United Church of Christ*, 10th Dist. No. 11AP-405, 2012-Ohio-453, ¶ 16 (affirming the trial court's finding "that hiking is a

recreational activity to which the doctrine [of primary assumption of the risk] applies, and hiking contains an inherent risk of slipping, tripping or falling that cannot be eliminated, even more so with hiking at night"); *Main v. Gym X-Treme*, 10th Dist. No. 11AP-643, 2012-Ohio-1315, ¶ 9, 12-13 (noting "[t]he rationale behind the doctrine [of primary assumption of the risk] is that certain risks are so intrinsic in some activities that the risk of injury is unavoidable," and finding that "tripping, slipping, and falling are all normal inherent risks" with " 'play time and gymnastic activities' "); *Schnetz v. Ohio Dept. of Rehab. & Corr.*, 195 Ohio App.3d 207, 2011-Ohio-3927, ¶ 30, 49 (10th Dist.) (noting that "[i]f that activity is one that is inherently dangerous and from which the risks cannot be eliminated, a finding of primary assumption of the risk is appropriate" and finding that "[i]njury resulting from colliding with another player on the field of play, even accidentally, is an ordinary danger of the sport of football").

{¶ 102}     I concur with the majority that to determine the risks that are so inherent in an activity that they cannot be eliminated, a court must " 'focus[] exclusively upon the activity itself.' "  (Lead opinion at ¶ 45, quoting *Schnetz* at ¶ 28.)  I would clarify further that the contention that a risk must be one that is so inherent to the sport or activity that it cannot be eliminated is appropriately considered in the context of the ordinary or customary analysis.  I would also suggest that in determining the same, a court should consider the goal of the primary assumption of the risk doctrine as discussed by the majority: " 'to strike a balance between encouraging vigorous and free participation in recreational or sports activities, while ensuring the safety of the players.' "  (Lead opinion at ¶ 38, quoting *Marchetti v. Kalish*, 53 Ohio St.3d 95, 99 (1990), and *Ferrari v. Grand Canyon Dories*, 32 Cal.App.4th 248, 253 (3d Dist.1995) (observing that the "overriding consideration in the application of primary assumption of the risk is to avoid imposing a duty which might chill vigorous participation in the implicated activity and thereby alter its fundamental nature"); *Yancey v. Superior Court*, 28 Cal.App.4th 558, 565 (5th Dist.1994) (noting that "[d]uty is constricted in such settings because the activity involves inherent risks which cannot be eliminated without destroying the sport itself").)

{¶ 103}     Finally, I concur with the majority's ultimate conclusion that the trial court erred in its primary assumption of the risk analysis because it failed to ascertain the

risks inherent in the activity of go-karting.  I dissent, however, with the majority's consideration and determination, in the first instance, of the same.

{¶ 104}        Because the Supreme Court in *Gallagher v. Cleveland Browns Football Co.*, 74 Ohio St.3d 427, 432 (1996), instructs that courts must proceed with caution when contemplating whether primary assumption of the risk completely bars a plaintiff's recovery and because of the great impact a ruling in favor of a defendant would have, I would not determine the issue in the first instance on appeal.  Rather, I would remand this case to the trial court with instructions to consider whether the risk of a go-kart veering off the track and striking objects/persons in its path meets the criteria that "(1) the danger is ordinary to the game; (2) it is common knowledge that the danger exists; *and* (3) the injury occurs as a result of the danger during the course of the game." (Emphasis added.)  *Santho* at ¶ 12.   In considering whether such risk is ordinary to the game, I would instruct the court to (1) focus on the activity of go-karting itself; and (2) consider whether such risk can be eliminated without inhibiting vigorous and free participation, fundamentally changing or destroying the activity of go-karting.   Such consideration necessarily involves an examination of the nature of the activity, the purpose or goals of the activity, and the rules or customs of the activity, where applicable.

{¶ 105}        Finally, I dissent from the majority's consideration of the second assignment of error.  Because I would reverse and remand this case for the trial court to determine, in the first instance, whether primary assumption of the risk applies, I would find to be moot the second assignment of error regarding whether the trial court erred in holding appellees did not act recklessly.[2]

---

[2] I would note that appellants' argument, pursuant to *Goffe v. Mower*, 2d Dist. No. 98-CA-49 (Feb. 5, 1999), that primary assumption of the risk cannot apply because appellees "enhanced" the risk by defective design or operation, would be appropriately addressed when considering whether the exception of recklessness or willfull or wanton conduct applies to application of primary assumption of the risk.